## William H. Rand and Andrew McNally v. B. Franklin Cronkrite, William E. W. Johnson and William W. Belvin.

1. ESTOPPEL—*Changing Ground.*—The principle invoked by the rule that when a party gives a reason for his conduct and decision, touching anything involved in a controversy, he can not, after litigation has been begun, change his ground and put his conduct upon another and different consideration, applies only to defects in form, matters of detail, objections which a party could easily have, and it is to be presumed would have, removed had they been objected to, so that an after insistence upon them is an injustice, they not being of the substance of the contract.

2. AGENCY—*Reasonable Time to Complete the Undertaking.*—Where an agency is not for a definite time, but the act to be done is one which requires time and labor for its completion, the agent is entitled to a reasonable time within which to complete his undertaking.

3. SAME—*Termination of by the Principal.*—Where an agency has been created to endure for a definite period, it can not be terminated by the principal unless for the agent's default, or by virtue of some agreement to that effect, without a liability to the agent.

4. SAME—*Breach of the Contract.*—If the principal unjustifiably terminates the agency, he is liable to the agent for the damages occasioned thereby, as in any other case of a breach of contract.

Assumpsit, for commissions. Appeal from the Circuit Court of Cook County; the Hon. CHARLES G. NEELY, Judge, presiding. Heard in this court at the March term, 1896. Reversed and remanded. Opinion filed April 27, 1896.

### STATEMENT OF THE CASE.

This suit was brought by appellees to recover from appellants the value of time as well as money, expended in and about the negotiation for the sale of the stock or business of Rand, McNally & Co. (a corporation of Chicago). There were three counts to the declaration, besides the common

counts, but no claim of right to recovery was made under the second count.

The first count set up that in December, 1891, defendants employed plaintiffs to negotiate a sale or exchange of the entire stock of Rand, McNally & Co., to parties in England, between that time and May 1, 1892, and that the defendants agreed that if they should procure a purchaser before May 1, 1892, defendants would pay to plaintiffs $85,700 in cash, and $64,300 in stock of a company to be organized and to succeed to the business of said Rand, McNally & Co.; that under said agreement the plaintiffs sent W. W. Belvin to London, who entered upon the business of negotiating a sale; that the defendants, " while the plaintiffs were conducting said negotiations, and long prior to May 1, 1892, wrongfully and without any fault on the part of the plaintiffs or either of them, notified them that they would not sell said stock, and that plaintiffs should proceed no further in and about said business; " that by means thereof, the plaintiffs lost the time and services of Belvin for a long time, and expended a large sum of money in necessary expense in going to and returning from London, and maintaining Belvin while there, and in paying for telegrams, correspondence, services and assistance in connection with said business.

The third count sought to recover for the same thing, but set out more in detail the terms of the employment.

Appellees insist that the proof showed that in July, 1891, the appellees made an arrangement with the appellants to sell the stock or business of Rand, McNally & Co., and a contract for that purpose was made between Andrew McNally and William W. Belvin, for the reason that Belvin was expected to do the business in London, and a power of attorney was given by McNally to Belvin; that Rand & McNally, at that time, either had or controlled 9,200 shares of stock of Rand, McNally & Co., and were to obtain as many of the remaining 800 as they could procure. The written contract provided that Belvin should have a commission of $85,700 in cash, and $64,300 in preferred and

common stock of the corporation to be organized, and which should succeed to Rand, McNally & Co.

The power of attorney then given by McNally to Belvin recited that, " Whereas, Andrew McNally, of the city of Chicago, State of Illinois, owning or controling 9,200 shares of the 10,000 shares, the entire capital stock of Rand, McNally & Co., of Chicago, Illinois, a corporation duly or-ganized, existing and doing business under and by virtue of the laws of the State of Illinois, is desirous of selling and conveying the entire capital stock of the said corporation, at and for the price of $2,000,000 in cash in hand paid at the date of the delivery of the said stock, and for the further sum of $1,500,000 in the paid up or non-assessable, fully issued capital stock of a corporation to be capitalized at $4,500,000, in equal shares of stock, of the par value of $100 each, which is to succeed the said Rand, McNally & Co.; and in case said capital stock of said new corporation is issued in part as preferred stock, and balance in common stock, the said stock payment of $1,500,000 is to be made in the same proportionate amount of preferred stock and com-mon stock as the entire amount of preferred and common stock are fully issued."

The power of attorney authorized Belvin to procure any European or other parties to purchase the stock at the rate of $200 cash per share, and $150 per share " of said cap-ital stock, at the same time, in the paid up or non-assessable, fully issued capital stock of a corporation to succeed said Rand, McNally & Co., capitalized at $4,500,000, in equal shares of stock of the par value of $100 each," etc.

The contract and power of attorney were executed and dated on the 17th of July, 1891, and the appellants fully understood that Cronkrite and Johnson, who were in busi-ness as B. F. Cronkrite & Co., were to share with Belvin in the profits of the transaction.

Having made this arrangement, Cronkrite & Co. ad-vanced to Belvin $10,000 in money and Belvin proceeded immediately to London, with a view of negotiating a sale of the business and earning for himself and Cronkrite and Johnson the commission promised.

At the time of receiving the contract and power of attorney Belvin was furnished with a very elaborate and descriptive statement of the assets and liabilities of Rand, McNally & Co., signed "Rand, McNally & Co., by Wm. H. Rand, president."

Mr. Belvin testified that at the time of making the July deal, the question whether this property had been ever before offered by any party in London was discussed, and that McNally told him that the property had never before been offered; that he was the first man they had ever discussed it with except Mr. Cronkrite, and that the property had never been offered in London.

Belvin, on his arrival in London, assiduously set to work to procure a contract for the sale of this large property, but on the 16th of October learned that the property had previously been on the market in London for sale for $2,500,000 or $1,000,000 less than he was authorized to sell the same for. Thereupon he took the first steamer home after telegraphing to Cronkrite. It appears that Cronkrite was absent when this telegram was received, and Mr. Johnson saw Charles Rand about it and then saw McNally. As a result of which a telegram was sent by appellees to Mr. Belvin as follows:

"McNally corresponded personally over a year ago with Gillig, basis, $2,500,000, all cash, conditions entirely different. Now they have all stock promised. Gillig had no authority to sell. They have been offered more for some of their real estate than when placed with you, also are receiving now for rent $4,000 more than given to you. You must exert yourself to place this deal. Can not see what Gillig matter has to do with it, as you have all the facts and figures before you, and if the prospective income was satisfactory when you left here, whatever was done a year or more ago does not affect the sale now."

Mr. Belvin, however, does not recollect ever having received this telegram, but before leaving London he obtained from Gillig a copy of his correspondence with McNally and Rand.

These letters, appellees claim, show that Rand and McNally, in 1890, offered to sell the entire property and business for the sum of $2,500,000, and while they then stated that they could not promise absolutely all of the stock, still they say that they can probably obtain five-sixths or seven-eighths; that "some of it is in the hands of the members of departments and foremen who would probably want to retain their holdings unless discharged from the service of the company."

On arriving in Chicago, Belvin and Cronkrite had a new interview with Rand and McNally, when, as stated, these letters were produced and some discussion had, and Mr. Belvin went to California. He returned about the 14th or 15th of December, had several interviews with Rand and McNally, and finally, on the 17th of December, Rand and McNally met Belvin, Cronkrite and Johnson in the office of Cronkrite & Co., and had a long interview. Concerning this interview there is a conflict between the evidence of the appellees and the appellants. The appellees (plaintiffs below) claimed that in that interview McNally and Rand authorized them to obtain a contract, sell the property for $2,750,000, $1,000,000 in cash, $875,000 in six per cent debentures, and $437,000 in preferred stock bearing eight per cent, and $438,000 in common stock of the company to be organized, which was to succeed to the business of Rand, McNally & Co.; that Rand and McNally agreed to pay the same commission they had agreed to pay under the previous arrangement, viz., $85,700 in cash and $64,300 in preferred and common stock of the proposed corporation in proportion as received; that McNally and Rand objected to putting the new arrangement in writing, but said that they had arranged for the stock and that plaintiffs should go ahead and that the defendants would "stand it," or carry out the arrangement.

Immediately after the arrangement of December 17th, Mr. Belvin again went to London. Early in March, 1892, he procured an offer for the purchase of the entire business and property of Rand, McNally & Co.

Rand v. Cronkrite.

When in London, Mr. Belvin employed counsel, Williams & James, and under their direction a proposed contract was executed by Mr. F. B. Behr, the proposed purchaser, by his attorney, and immediately forwarded to Chicago, where it arrived on the 23d of March, 1892.

On the 26th of March, the proposal was sent to Rand and McNally, who returned it through Charles Rand on March 31st. Cronkrite then had an interview with W. H. Rand, who, it is said, "replied, simply, to Cronkrite, that the business was not then for sale; that they had decided not to sell the business and that the contract with them had expired by limitation," and Cronkrite testified that he pressed Rand for his reasons, but he refused to make any further answer. Thereupon Cronkrite sent a telegram immediately to Mr. Belvin, notifying him of the fact, and stating "Rand will not accept contract. Says business is not for sale now, and that our contract expired by limitation and was not renewed in any way"

The proposed agreement was substantially as follows:

" An agreement made the —— day of ——, one thousand eight hundred and ninety-two, between Messrs. Rand, McNally & Company, of Chicago, United States of America, hereinafter called the vendors, of the one part, and Fritz Bernhard Behr, of 10 Drapers Gardens, London, gentleman, hereinafter called the purchaser, of the other part; whereas, the purchaser has it in contemplation to purchase the business and property of the vendors; and whereas, the vendors have made to the purchaser certain representations and statements in connection with their business and premises, showing the value thereof, which representations and statements have been embodied in a paper writing annexed hereto and hereinafter referred to as the statement; and, whereas, with the object aforesaid of purchasing the property of the vendors, the purchaser intends to form a limited liability company, to be incorporated under English law, to acquire (either directly or through the instrumentality of an American corporation) the said business and property of the vendors, and the purchaser intends that such English com-

pany (hereinafter referred to as the English Company) should be formed with a share capital of four hundred and sixty thousand pounds, divided into forty-six thousand shares of ten pounds each, of which twenty-three thousand shall be preferred shares, entitled to a cumulative preferential dividend at the rate of eight per centum per annum and to priority over other shares in the distribution of assets, and the remaining shares shall be ordinary shares, namely, two hundred and thirty thousand pounds, and with power to borrow sums not exceeding the sum of two hundred and thirty thousand pounds, by an issue of debentures bearing interest at six per centum, to be secured by a first mortgage of all its undertaking. Now, it is hereby agreed by and between the parties hereto as follows:

1. Subject, as hereinafter provided, the vendors shall sell, and subject, as hereinafter provided, the purchaser shall purchase, first, all and singular, the premises and hereditaments of the vendors, particulars of which are specified in the schedule hereto and in the statement annexed; second, all the plant, machinery, buildings, erections, steam engines and other machinery, tools and fixtures appurtenant to the said business and premises as a manufacturing concern, together with all other chattels and effects of the vendors used in connection therewith; third, the stock in trade and the benefit of all contracts and engagements to which the vendors shall be entitled, in relation to the said business at the date up to which the report hereinafter referred to upon the properties hereby agreed to be sold is made (which date is hereinafter called the certified date); fourth, the good will of the said business and the right to use the name of the vendors, and to represent that the purchaser or his assigns is carrying on the business in continuation of the said business of the vendor; fifth, all copyrights, the property of the vendors, and all bills receivable by the vendors, cash in hand, and debts owing to the vendors in connection with the business on the certified date, and all stock held by the vendor firm in other companies in connection with the said business.

2. The consideration for the said sale shall be the sum of five hundred and sixty-seven thousand pounds sterling, provided that if the English company is formed, as hereinafter provided, the purchase money may be satisfied as to one hundred and eighty thousand pounds part thereof by the allotment of debentures of the English company, of the issue aforesaid as to ninety thousand pounds thereof, by the allotment of preference shares in the English company to that nominal amount, and as to ninety thousand pounds thereof by the allotment of ordinary shares in the English company to that amount, such preference shares to be those numbered from one to —, and the ordinary shares, those numbered from —— to ——, both inclusive, and such shares shall be issued as fully paid up, and no calls shall be made in respect thereof; the balance of two hundred and seven thousand pounds being payable in cash in the manner hereinafter provided.

3. The business and the said properties of the vendors shall be deemed to have been purchased by the purchaser from the vendors as from the certified date. And it is hereby agreed that from the certified date until the completion of the purchase and of the provisions hereinafter contained, the vendors shall carry on their business in all respects as hitherto with and upon the said premises hereby agreed to be sold and for and on account of the purchaser.

4. In addition to the purchase price aforesaid the purchaser shall allow and pay to the vendor's interest at the rate of five per centum per annum on the respective installments of the said balance of two hundred and seven thousand pounds from the certified date until the installments hereinafter provided shall be respectively paid; and shall also pay interest at the like rate from the certified date on that portion of the purchase money which may be satisfied by the allotment of debentures, until the date when the said debentures are issued, or from that at which interest shall begin to run on the debentures, and shall also pay interest at the like rate from the same date on that portion of the purchase money, which may be satisfied by· the allotment

of preference and ordinary shares respectively, until the allottees thereof are entitled to rank for dividend. The payment of the cash must be *pari passu* with the collection of calls on allotment, say the first payment fourteen days after allotment and the balance *pro rata* with the calls made.

5. The said balance of two hundred and seven thousand pounds shall be paid in cash as follows: One-tenth within fourteen days of the issue of the English company's prospectus hereinafter referred to, and the balance by three equal installments, the first within seven days of the first allotment of shares in the English company to the public; the second within six weeks, and the balance within ten weeks after such allotment as aforesaid. Together with each installment shall be paid the interest accrued due thereon, and there shall also be paid with the first installment the interest on the nominal amount of debentures. The several sums hereby agreed to be paid (other than the final balance payable within ten weeks of allotment, and the interest thereon) shall be paid in the first instance to the—— bank to the joint account of the vendors and purchaser, to remain in escrow awaiting the completion of the purchase, provided that when the date for completion has arrived the same shall belong to the vendors absolutely, and the purchaser shall execute and do all documents and things necessary to obtain immediate payment to them thereof. On payment of the first installment of the purchase price into the said joint account, the vendors will deposit at the—— bank all their documents and evidences of title relating to the property agreed to be sold, and the same shall remain there until completion.

6. The said one hundred and eighty thousand pounds debentures, ninety thousand pounds preference shares, and ninety thousand pounds ordinary shares, shall be allotted within fourteen days of the issue of the English company's prospectus hereinafter referred to. Each of the vendors, or their nominees, shall, if he so long lives, hold in his own name the whole of the shares alloted to him until completion of the purchase, when the certificates of such shares shall be delivered to him.

7. The profits of the said business, as from the twenty-ninth day of February, one thousand eight hundred and ninety-two, up to the certified date, shall be excepted from the sale, and the profits of the said business for the year ending the twenty-ninth day of February, one thousand eight hundred and ninety-two, shall, as soon as conveniently can, be ascertained, and a sum bearing the same proportion to such last mentioned profits as the period between the twenty-ninth day of February, one thousand eight hundred and ninety-two, and the certified date shall bear to one year, shall be deemed to be the amount of the excepted profits, and such sum shall be paid to the vendors prior to the completion of the purchase, less any sums which shall have been previously drawn by the vendors, or either of them, on account of such profits.

8. The vendors will, at their own expense, prove their title to the whole of the properties hereby agreed to be sold free from incumbrances, good and sufficient in all respect in accordance with the laws of the state in which the specific property is situated, and will also allow any experts or other persons appointed by the purchaser to inspect and examine the premises and business, and all books, papers and accounts connected therewith and subject to the fulfillment of the conditions hereby imposed upon the vendors. The purchase is to be completed upon the payment or satisfaction of the whole of the purchase price, and other moneys payable to the vendors, and as from that time the purchaser is to be let into possession of the properties hereby agreed to be sold.

9. Upon the payment of the purchase money, and other moneys payable to the vendors, and the allotment and delivery as aforesaid, of the debentures, preference and ordinary shares in the English company, the vendors and all other necessary parties will, at their own expense, execute and do all such acts, deeds, assurances, and things as may be reasonably required for vesting in the purchaser, or his nominee, the properties hereby agreed to be sold.

10. The purchaser will, within fourteen days after re-

ceiving notice of the execution by the vendors of this agreement or of a counterpart or duplicate hereof, appoint some member of the firm of Messrs. Turquand, Young & Co., of London, accountants, or, failing them, some other well known accountants, and, if necessary, other persons, to examine the properties hereby agreed to be sold, and will procure such person or persons to report to him the result of his or their examination with all convenient speed, and will take his or their opinion or report thereon as to the value thereof, and if such accountant or other person or persons appointed by the purchaser, shall substantially confirm the facts and representations set forth in the reports to the purchaser that the said properties hereby agreed to be sold are of such value, and that the income to be derived therefrom is of such an amount, and the business carried on there is of such a volume and nature as respectively set out in the statement annexed hereto, and generally that the representations set out in such statement are true and accurate, the purchaser shall proceed with this agreement, but if such accountant or other person or persons as aforesaid shall not substantially confirm the said facts and the said statement, and the representations contained therein are not accurate and true, then the purchaser shall be at liberty, within fourteen days after the first receipt by him of such report, but not later, to put an end to this agreement by giving to the vendors notice in writing or by cablegram of such his determination, it being understood that this agreement is based upon the statement in this clause referred to. In the event of the purchaser putting an end to this agreement under this clause the vendors shall have no claim upon him in respect of this agreement or otherwise whatsoever. Any notice to be given hereunder by the purchaser to the vendors may be given by sending the same to them either by letter or cable addressed to them at 166–168 Adams street, Chicago.

11. The instructions given to the experts, accountants or other person or persons appointed to make such inspections or examinations as aforesaid, shall be a copy of this

agreement and statement, and they shall be directed to ascertain the profits realized in the vendor's business and the value of the buildings, good will and assets to be transferred to the English company, so far as the same are set forth in the said statement.

12. The vendors will, upon the execution hereof by them, deposit at the ——— bank, in the joint names of themselves and the purchaser, a sum of $4,000 (four thousand dollars), which shall be handed to the said accountants or experts on their leaving America, provided that if the purchaser shall determine on their report to complete this contract, he shall, on the completion of the purchase, repay the said $4,000 to the vendors.

13. The vendors will, if so required by the purchaser, use their best efforts to procure the continuance of the services of the staff and employes now connected with the said business, when the same is handed over to the purchaser.

14. The purchaser shall (subject to this power of determining this agreement hereinbefore contained), within forty-five days of the first receipt by him of a report on the said properties, procure the incorporation under the English companies acts, of a company with liability limited by shares, and having for its object (among other things) the acquisition of the property hereby agreed to be sold, and with a nominal capital of four hundred and sixty thousand pounds, divided into twenty-three thousand ordinary shares of ten pounds each, and twenty-three thousand preference shares of ten pounds each, conferring the right to a fixed cumulative preferential dividend at the rate of eight per cent per annum, and also ranking, as regards capital, in priority to the ordinary share, and with power to issue first mortgage debentures to an amount not exceeding two hundred and thirty thousand pounds, bearing interest at six per cent per annum, and charged on the English company's undertaking; the memorandum and articles of the English company shall not be registered until they have been sub-mitted to and approved of by the vendors or some one on their behalf.

15. The purchaser will procure the English company, as soon after its incorporation as is reasonably prudent, having regard to the then state of the London money market, to offer for public subscription, by a prospectus, the whole of the shares in the capital of the English company, less those to be taken by the vendors pursuant to this agreement, and any additional shares to be taken as part of the purchase price paid by the English company; also the whole of the two hundred and thirty thousand debentures of the English company, less those to be taken by the vendors pursuant to this agreement, and any additional debentures to be taken as part of the purchase price to be paid by the English company, and the purchaser shall use his best endeavors to place such shares and debentures, provided that if the purchaser is unable to satisfy the vendors, within four calendar months from the date of the said report, that responsible persons other than the vendors have agreed to subscribe for shares and debentures to an amount deemed satisfactory by the vendors, or that shares and debentures to the like amount are underwritten, then the vendors may, by notice in writing to the purchaser, rescind this agreement.

16. The first directors of the English company shall be seven in number, of whom three shall be nominated by the vendors.

17. The purchaser hereby undertakes that the English company's shares (other than those to be taken as fully paid) shall be payable by such installments as shall enable the purchase money to be paid at the times and in the manner aforesaid.

18. The purchaser is at liberty to transfer the benefit of this agreement or to re-sell the properties hereby agreed to be sold at a profit to the English company direct, and in such event the term "Purchaser" is to be considered (unless repugnant to the context) to mean as well such English company as the said F. B. Behr.

19. The purchaser shall cause a sufficient agreement to be filed with the registrar of joint stock companies before any shares are allotted as part of the purchase price.

20.   If any part of the purchase money remains unpaid or unsatisfied for six calender months from the date of the said report the vendors may, by such notice to the purchaser, rescind this agreement, but such rescission shall be without prejudice to the vendors' right to interest on the purchase money up to the date of rescission.

21.   For the purposes of this agreement, any notice may be served on the purchaser by sending the same through the post, or by cablegram addressed to him at 10 Drapers Gardens, London, and shall be deemed, if sent through the post, to have reached him in due course of post, or if sent by cablegram to have reached him the same day.

In witness whereof, the said parties have hereunto set their hands."

There was a finding and judgment for appellees for $10,000.

Geo. L. Paddock and H. T. Gilbert, attorneys for appellants.

Flower, Smith & Musgrave, F. J. Smith and Henry W. Wolseley, attorneys for appellees.

Mr. Justice Waterman delivered the opinion of the Court.

The question presented by this case is almost entirely one of fact, viz:   Did the appellees make such a sale of the property or stock of appellants as entitled them to compensation therefor?

Appellees did not make a sale in accordance with the written power of attorney, which sale was to be for $2,000,000 cash in hand and $1,500,000 in paid up stock of a corporation capitalized at $4,500,000; this is not claimed.   Appellees claim that a new arrangement was made, under which they were to sell the property for $1,000,000 cash, $875,000 in six per cent debentures, $437,000 in preferred stock bearing eight per cent, and $438,000 in common stock—total $2,750,000.   Did they make such sale?

The proposed agreement for sale procured by the appel-

lees, recited that the purchaser intended to form an English company with a capital share of 460,000 pounds, divided into 46,000 shares of ten pounds each, of which 23,000 should be preferred shares, entitled to a cumulative preferential dividend of eight per cent per annum, and the remaining ordinary shares with power to borrow not exceeding the sum of 230,000 pounds by an issue of debentures.

The consideration for the sale was to be 567,000 pounds sterling, provided that if the English company was formed the purchase money as to 180,000 pounds might be satisfied by the allotment of debentures of the English company, and as to 90,000 pounds by the allotment of preference shares in the English company to that nominal amount, and as to 90,000 pounds by the allotment of ordinary shares in the English company.

The balance of 207,000 pounds was to be paid in cash as follows : one-tenth within fourteen days of issue of the English company's prospectus, and the balance by three equal installments, the first within seven days of the first allotment of shares in the English company, the second within six weeks, and the balance within ten weeks after such allotment.

The several sums agreed to be paid, other than the final balance, and the interest thereon, to be paid in, the first to the ——— bank to the joint account of the vendors and purchaser, to remain in escrow awaiting the completion of the purchase. The purchaser was, within forty-five days of the receipt by him of a report on the properties, to procure the incorporation of the said English company, and as soon as was reasonably prudent, having regard to the then state of the London money market, offer by a prospectus for public subscription the whole of the shares in the English company, less those to be taken by the vendors, also all the debentures, less those to be taken by the vendors, provided that if the purchaser should be unable to satisfy the vendors within four months from the date of the said report that responsible persons, other than the vendors, had agreed to subscribe for shares and debentures deemed satisfactory to the vendors, or that shares and debentures to the like amount

were underwritten, then the vendors might rescind the agreement, and if any part of the purchase money should remain unpaid for six months from the date of the said report, the vendors might by notice rescind the agreement.

We do not see how it can be seriously contended that such proposed sale was a fulfillment of an undertaking to sell for $1,000,000 cash and $1,750,000 in stock and debentures.

The proposition was perhaps fair enough, but appellants did not see fit to accept it, and they did not authorize appellees to sell or to procure an offer under which appellants might never receive either cash or anything else of value.

The offer of payment, so far as it had value, was wholly contingent upon the success that might follow an offer for sale of the stock and debentures of the proposed English company.

It is said that Mr. Rand did not put his refusal to accept the offer upon the ground that it was not in accordance with the terms he had given appellees.   If this be so, it did not make the offer a compliance with such terms.   Appellees claim to have procured a *bona fide* offer of purchase from a responsible party on the terms proposed by appellants.   The question is, did appellees procure such offer, not what appellants said about the proposal.

Appellees urge that appellants having placed their refusal upon the ground that the time for making a sale had expired, can not now object that they had never authorized a sale upon the terms proposed; and appellees cite the remark of the Supreme Court of the United States appearing in Railway Co. v. McCarthy, 96 U. S., page 258–267, that "where a party gives a reason for his conduct and decision, touching anything involved in the controversy, he can not after litigiation has been begun, change his ground and put his conduct upon another and a different consideration.   He is not permitted thus to mend his hold.   He is estopped from doing it by a settled principle of law."

As applicable to the facts of that case the statement was proper and pertinent, but if cited as a declaration of the law as to all controversies, it is incorrect and entirely unsupported by authority.

It is not the case that if one agree to purchase 100 fat sheep if delivered to him in thirty days, he is responsible in damages when 100 lean hogs are tended to him in twenty days, if the only objection he makes to their reception is that the contract has expired. Nor is one who borrows money, agreeing to pay in six months with interest at the rate of four per cent per annum, bound to pay interest at the rate of seven per cent per annum because when, at the end of six months, payment with such interest is demanded, his only objection is, that the debt is not due.

The principle invoked by appellees applies only to defects in form, matters of detail, objections which a party could easily have, and it is to be presumed would have, removed had they been objected to, so that an after insistence upon them is an injustice, they not being of the substance of the contract. Johnson v. Oppenheim, 55 N. Y. 291; Bigelow on Estoppel (5th Ed.), p. 662; 28 Am. and Eng. Ency. 530, and cases cited.

There is no authority for holding that a mere arrangement for a sale, with no cash paid down, but a condition that if at the end of six months all the cash has not been paid, the vendors may rescind the contract, is a fulfillment of an authority to sell for, among other things, $1,000,000 cash.

That where, by express or implied contract, an agency has been created to endure for a definite period, it may not be terminated by the principal unless for the agent's default, or by virtue of some agreement to that effect, without liability to the agent, is the case.

And where, though the agency is not for a definite time, yet the act is one which requires time and labor for its completion, the agent is entitled to a reasonable time within which to complete his undertaking. Mechem on Agency, Sec. 620; Sibbald v. Bethlehem Iron Co., 83 N. Y. 378; Warren C. & M. Co. v. Holbrook, 115 N. Y. 586; Day v. Porter, 60 Ill. App. 386.

And if the principal unjustifiably terminate the agency, he is liable to the agent for the damages occasioned thereby,

as in any other case of a breach of a contract.    Mechem on Agency, Sec. 621.

We are not, however, called upon to say what the rights of appellees would have been had they, when the proposed contract of sale was rejected, gone on and effected a sale in accordance with the authority given to them.    Instead of doing this, or insisting upon their right so to do, they stood upon the proposal by them procured and tendered, sending to appellants the following letter :

"GENTLEMEN :   You authorized us to procure for you a purchaser for all the property belonging to Rand, McNally & Company, a corporation, upon certain terms and conditions.    After much labor and expense, we have procured a purchaser, who is ready, able and willing to purchase the property of the corporation for the price and upon the terms and conditions named by you, and we have a contract signed by him for the purchase of the property, which we are ready to present to you for signature.

Will you kindly advise us, upon the receipt of this letter, when and where we can meet you and close the matter up ?

Yours truly,

B. F. CRONKRITE & Co."

Thus claiming that the terms of sale agreed to by Mr. Behr were such as appellants had agreed to accept.

Appellees rested and rest upon this proposition; they do not claim to have done more than this.

Such proposition was not a fulfillment of the undertaking of appellees.

The judgment of the Circuit Court is reversed and the cause remanded.