(No. 26202.—

JULIA GROSSMAN WALL, *et al.* Appellees, *vs.* THE CHICAGO PARK DISTRICT, Appellant.

*Opinion filed Sept. 17, 1941—Rehearing denied November 18, 1941.*

82

SHAW, J., specially concurring.

WINSTON, STRAWN & SHAW, and JOHN O. REES, (RALPH M. SHAW, JOHN D. BLACK, PHILIP A. LOZOWICK, and GERARD E. GRASHORN, of counsel,) for appellant.

CAMPBELL, CLITHERO & FISCHER, (DELBERT A. CLITHERO, and RAYMOND P. FISCHER, of counsel,) for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

A decree of the circuit court of Cook county rescinded a contract entered into between Edward S. Shepherd and his wife, Julia M. Shepherd, and the commissioners of Lincoln Park by which the former agreed to convey riparian rights to the latter and ordered their reconveyance. From this decree, the defendant, the Chicago Park District, successor by consolidation to the commissioners of Lincoln Park, prosecutes a direct appeal, a freehold being involved.

The plaintiffs, Julia Grossman Wall, Josephine Shepherd and Julia Shepherd Cuneo, are the successors in interest to Edward S. Shepherd and Julia M. Shepherd, who owned an improved parcel of real estate in Chicago, known as 6341 North Sheridan Road. This property is bounded on the west by Sheridan Road and on the east by Lake Michigan. On and prior to January 28, 1913, one of the valuable appurtenances to the property consisted of riparian rights in the lake. On the day named, Edward S. Shepherd and his wife executed and delivered to the commissioners of Lincoln Park an agreement with respect to the riparian rights. The contract dated June 12, 1912, but acknowledged January 18, 1913, recited that the commissioners had decided to make an enlargement and extension of Lincoln Park upon the public waters of Lake Michigan conformably to "An act to enable park commissioners having

control of any park bordering upon public waters in this State, to enlarge the same from time to time, and granting submerged lands for the purpose of such enlargements and to defray the cost thereof," in force July 1, 1895, and an amendment to section 2 of the 1895 statute, effective July 1, 1903. The agreement further stated that in pursuance of the decision and purpose of the commissioners previously set forth, they had prepared and adopted plans for the extension of Lincoln Park, as contemplated by the statute, located thereon a boulevard or driveway over the bed of Lake Michigan, and provided for the reclamation of the submerged lands of the lake required for the extension and for the boulevard or driveway. These plans, it was declared, had been spread upon and become a part of the records of the commissioners. The contract next recited that the commissioners had caused an estimate to be made showing the cost of the construction of the boulevard or driveway, and the filling in and reclamation of all the submerged lands lying between the inner line of the boulevard and the shore line of Lake Michigan; that they proposed to construct the boulevard and reclaim the submerged lands in substantial compliance with the plans and, hence, were desirous of acquiring the riparian rights pertaining to the property owned by Edward S. Shepherd, to be utilized for the purpose of the enlargement of the park. In consideration of the performance by the commissioners of the agreements and conditions contained in the contract, Shepherd agreed that the line of division between the property of Lincoln Park and his private abutting property should be adjudged and determined in a proceeding instituted for this purpose in the circuit court of Cook county pursuant to the 1903 statute. The contract recited further that the parties had caused the question of the correct boundary line between Shepherd's real estate and the submerged lands of the commissioners to be examined by competent engineers and other skilled and suitable persons who agreed that

the line described and indicated on an accompanying plat marked "West line of Lincoln Park" was the boundary line between Shepherd's land and the park property. Thereafter, a proceeding was instituted in the circuit court of Cook county, pursuant to the contract, and the Lincoln Park commissioners answered the bill of complaint, admitting the correctness of the boundary line. A final decree was rendered April 6, 1913, confirming the boundary. Thereupon, Shepherd and his wife conveyed the riparian rights pertaining to their property to the commissioners of Lincoln Park and the deed was duly recorded on April 9, 1913.

Section 3 of the Submerged Land act of 1895, (Cahill's Stat. 1929, chap. 105, par. 189, p. 1879) so far as relevant, provided that the submerged lands reclaimed pursuant thereto should be improved and used as follows: "First. For the purpose of constructing and maintaining the boulevard or driveway as in said plan located. Secondly. For the purpose of filling, reclaiming, improving, maintaining and holding such portions as are so designated upon said plan as a public park." The commissioners caused a plan of the proposed extension of Lincoln Park to be prepared and, on November 25, 1895, adopted the plan and, also, an estimate for the improvement. The second resolution estimated the cost of construction of the boulevard driveway at $2,016,263.70, and of the filling and reclamation of all of the submerged lands lying between the inner line of the boulevard and the shore line of Lake Michigan, $1,702,500, a total cost of $3,718,763.70. The plan adopted by the commissioners, November 25, 1895, is the plan referred to in the agreement between Shepherd and the commissioners. The southern terminus of the park, shown by the 1895 plan, is Grace Street (3800 North). This plan covered the shore line from Grace street north to Devon avenue (6400 North) a distance of slightly over three miles. Actual construction in accordance with the 1895 plan had not started prior to 1912. There was, however, some development at the time

between Diversey boulevard and Belmont avenue four miles to the south of plaintiffs' property and also south of Grace street. Between the date of the execution of the contract and 1920 the only progress in the construction of the park shown on the 1895 plan was the construction of a breakwater protecting the south two blocks of the area from Grace street to Irving Park boulevard (4000 North) and the completion of part of the fill within this short breakwater. This construction was substantially the same as shown on the 1895 plan. About 1926, the commissioners commenced work at the south end of the area shown by the 1895 plan, constructing and filling certain portions of the submerged lands extending out approximately four times as far from the existing shore line of Lake Michigan as the construction indicated on the 1895 plan. On the other hand, neither the commissioners of Lincoln Park nor their successor, the Chicago Park District, have ever done any construction work north of a line a short distance north of the north line of Foster avenue (5200 North) projected eastward, and have never done any construction work or filled any portion of the submerged lands within a mile and a quarter of plaintiffs' property. As a result, plaintiffs' property was afforded no protection from damage by storms arising on Lake Michigan, and it appears their property is still exposed to such damage. In 1929, a storm occurred which destroyed the existing sea wall protecting their property from the waters of the lake, and undermined and washed away a large part of their land. In 1929 and 1930, plaintiffs' predecessors in title were compelled to expend $6,645.50 in replacing the sea wall and in restoring portions of the property destroyed by the storm. The new sea wall was constructed along the line of the existing sea wall, and consists of interlocking steel piling not over four inches thick driven across and against the remains of the existing sea wall. At no point does the sea wall extend as far east as the line determined by the circuit court of Cook

county in 1913 as the correct boundary line of plaintiffs' property. In 1938, a section of the sea wall was undermined, necessitating an expenditure of $760 in restoring it.

In 1929, the commissioners of Lincoln Park employed a consulting engineer, Hugh E. Young, who began work on a new plan for the extension of Lincoln Park northward from Montrose avenue (4200 North). In 1931, the General Assembly enacted a statute with respect to the reclamation of submerged lands for the purpose of extending parks. The 1931 statute repealed the Submerged Land act of 1895. The repeal section of the present law (Ill. Rev. Stat. 1939, chap. 105, par. 85a, p. 2239) recites that the repeal shall not be construed or held to "avoid or impair any grant made or right acquired," under the 1895 act, "except as such rights may be altered or affected by agreement, contract or deed hereunder or by judgment or decree of a competent court hereunder, or by condemnation under the authority hereof." With the exception of the statement of the purposes for which the proposed park was to be used, provisions of the 1931 act closely resemble those of the 1895 act, as amended. The expressed objectives of the 1931 act, so far as the use of property acquired is concerned, are enumerated in section 6 as follows: (1) Filling, reclaiming, improving, maintaining and holding the same as a public park; (2) constructing and maintaining boulevards, driveways and parkways for public convenience, and (3) creating, constructing and maintaining lagoons and harbors for boats and for establishing and maintaining rules and regulations for the use thereof by the public. These purposes differ from those specified in the 1895 act in important particulars. First, the earlier law provided for the construction of a single boulevard or driveway, whereas the 1931 enactment provides for the construction of multiple boulevards and driveways. Secondly, the 1895 act prescribed that the single boulevard be at the outer edge of the proposed park, and called for a sea wall at

its outer edge. The 1931 act contains no such requirements with reference to the locations of any of the proposed boulevards. In the third place, the former statute provided that all the land between the boulevard and the previously existing shore line should be filled, whereas the 1931 act authorizes the construction of lagoons conforming to its provisions.

The commissioners prepared, adopted and recorded a new plan. The two plans, namely, the 1895 and 1931 plans, were introduced in evidence. An inspection and examination discloses significant differences between them. The 1895 plan indicates a narrow park 740 feet opposite plaintiffs' property. At the outer edge of the park is a 212-foot boulevard including a single 50-foot driveway, a lawn area, a combination of bridle and bicycle paths, and a 50-foot breakwater at its outer edge. No intersecting streets are projected into the proposed park. The 1895 plan shows the boulevard area in detail and, according to qualified witnesses, indicates a fairly level fill of grass and trees between the boulevard and plaintiffs' property. A consulting engineer and writer on engineering and excavation testified that the 1895 plan indicated a flat fill approximately 11 feet above Chicago city datum or approximately 9 feet above the mean level of Lake Michigan. The new plan, on the other hand, shows a park 4660 feet wide opposite plaintiffs' property, and lying between it and Lake Michigan. The inner or west part of this park contains both a 40-foot service drive and "an outer drive," which is to be a double highway with a traffic separator in the center, and, excepting on the turns and grade separations, is to have a uniform width of 225 feet from curb to curb. This proposed outer drive passes across the major intersecting streets by means of clover-leaf grade separations. East of the outer drive the plan shows another parkway and a 30-foot driveway, next a bridle path and, finally, a large lagoon marked "Thorndale Lagoon." The widest portion of this lagoon

area is 1340 feet measured in an east and west direction. East of the lagoon, the plan indicates a parking drive 40 feet wide and a parking space 82,000 square feet in area. The new plan also locates a bath-house, 385 feet long, in the park directly east of plaintiff's property. The bath-house is 40 feet wide at its narrow portion and 55 feet wide at the center. East of the bath-house the plan indicates miscellaneous sidewalks and a public bathing beach.

Real estate experts testified as to the effect on the value of plaintiffs' property of removing it more than three-fourths of a mile from Lake Michigan according to the 1931 plan, as compared with the distance of less than 1000 feet shown on the 1895 plan. Although their testimony is in hopeless conflict, they were for the most part in accord with the conclusion that the value of property in the vicinity of plaintiffs' property diminishes as the distance between such property and the waters of Lake Michigan increases, and, further, that the value of such property also decreases as the number of roads and the volume of traffic between the property and the lake increase. Indeed, one of defendants' witnesses testified that by reason of the uncertainty resulting from the adoption of the 1931 plan, and as to when it would be consummated, a chaotic condition had arisen which had impaired the marketability of the property in the vicinity for a considerable period of time. It may be stated, generally, that the market value of the plaintiffs' property has been diminished as a result of the condition described, although the amount of the diminution is not susceptible of precise mathematical computation.

In 1928, the commissioners instituted twenty-six condemnation suits seeking to condemn riparian rights in the area covered by the 1895 plan, rights which had not been acquired through deeds. So far as the record discloses, only one of these actions has been tried. (*Comrs. of Lincoln Park* v. *Schmidt*, 375 Ill. 474.) Three suits have been

dismissed, and the commissioners have interposed motions to dismiss the remaining twenty-two. These motions, it appears, are still pending disposition.

September 21, 1937, the plaintiffs filed their complaint seeking a rescission of the contract of June 12, 1912, and a reconveyance of the riparian rights quit-claimed to the commissioners of Lincoln Park. By its answer, the defendant denied that the 1931 plan provided for a substantial departure from the 1895 plan and that the commissioners had failed to do or perform any act to carry out either the old or the new plan. Defendant averred that plaintiffs knew or should have known of the reclamation by the commissioners of over 400 acres of submerged land and the construction of a boulevard thereon south of Foster avenue at a cost of over $34,000,000 in conformity with the 1931 plan and that, by their silence and acquiescence, plaintiffs had ratified the acts done in connection therewith by the commissioners and the defendant, and, further, that if a cause of action had accrued to plaintiffs by virtue of any act of the commissioners or the defendant at variance with the 1895 plan they were guilty of *laches*. Replying, plaintiffs denied the material averments of the answer. The cause was referred to a master in chancery who, after extended hearings, recommended the entry of a decree granting plaintiffs the relief sought. On the basis of the facts previously narrated, the master concluded that the defendant and its predecessor had wholly failed to carry out the construction indicated by the 1895 plan, such construction constituting the consideration for the conveyance of the riparian rights to plaintiffs' property to the commissioners of Lincoln Park; that the consideration which plaintiffs' predecessors in title were entitled to receive had wholly failed by reason of the defaults of the commissioners of Lincoln Park and the defendant, and that, by reason of their failure to construct the improvement shown on the 1895 plan in the vicinity of plaintiffs' property and the

adoption of a new and conflicting plan, the commissioners created a chaotic condition and impaired the marketability of plaintiffs' property, thereby causing plaintiffs to suffer irreparable damage. The chancellor approved the master's report and rendered a decree rescinding the contract between plaintiffs' predecessors in title and the commissioners of Lincoln Park and ordered a reconveyance to the plaintiffs of their riparian rights appertaining to their real estate. This appeal followed.

To obtain a reversal, the defendant contends that the contract of June 12, 1912, did not require the construction of a boulevard and the reclamation of submerged lands between the inner line of the proposed boulevard and the waters of Lake Michigan within any given time, or in accordance with any definite plan, and that, accordingly, the lapse of twenty-five years between the date of the contract and the commencement of this litigation did not work a breach of the agreement. To support its contention, the argument is advanced that the proposed construction of a small and narrow park under the 1895 plan was not the consideration for which riparian rights were deeded to its predecessor. The contract of June 12, 1912, recites that in consideration of the "premises" and the mutual agreements of the parties, and Shepherd in consideration of the performance by the commissioners of Lincoln Park, of the "agreements and conditions herein contained," promised to convey riparian rights. The "premises" are, without question, the preceding recitals as to the preparation and purpose of the commissioners to construct the improvement "in substantial compliance" with the 1895 plan. Defendants' argument that these statements appearing in the preamble of the contract, state merely a proposal of the commissioners, and do not express a covenant by them, is without merit. Although the provision for the construction of the park does not appear as an express covenant, it is, however, the controlling condition upon which the

contract to convey riparian rights is based. Under such circumstances, the rule invoked by defendant to the effect that a preamble is an introductory or explanatory statement and is not considered a part of the law, a resolution, or a document (*Coverdale* v. *Edwards*, 155 Ind. 374) is inapplicable here. The rule applicable to the facts in the present case is, instead, that preliminary recitals of an agreement become binding obligations when so referred to in the operative portion of the instrument as to show a design they should form a part of it. (*Trower* v. *Elder*, 77 Ill. 452.) Construing a similar contract in *Robbins* v. *Lincoln Park Comrs.* 332 Ill. 571, this court said: "The deed shows that the transfer of the riparian rights is for park purposes. It was a conveyance of a valuable property right. It seems clear from a consideration of the contract, the plan required and the purpose contemplated by the act [1895 act] that the boulevard intended to be constructed is the one specifically set out in the plan. While these do not forbid the building of another boulevard, yet a boulevard which would interfere with the use of the intervening submerged lands as a park when the same shall have been filled in, is contrary to the plan of the act to use such lands as a park, and the averment in the bill that the commissioners propose to build across these submerged lands, when so filled, an elevated structure which will interfere with the use of such lands for park purposes as contemplated in the act and will result in injury to the property rights of land owners, is sufficient, if true, to authorize the granting of relief prayed in the bill." Clearly, the construction of the park extension in accordance with the 1895 plan was the consideration for Shepherd's deed of the riparian rights appertaining to his property. The fact that the contract did not require any work to be done under it within a specified time does not aid defendant. In such cases, the law fixes a reasonable time for performance of the contract. (*Smith* v. *Gray*, 316 Ill. 488; *Hamilton* v. *Scully*, 118 id.

192.) The facts previously recounted affirmatively demonstrate that defendant and, earlier, the commissioners of Lincoln Park, have long been in default in performance of the contract.

Defendant points out that the purpose of the creation and maintenance of the park district and the duties imposed upon the commissioners in carrying out such purpose mark the park as having been constructed and maintained as a governmental function (*LePitre* v. *Chicago Park District,* 374 Ill. 184) and that a muncipal corporation is not bound to construct an improvement within any definite time. *People* v. *Superior Petroleum Co.* 372 Ill. 546, and *Brown* v. *Trustees of Schools,* 224 id. 184, announce the familiar doctrine that statutes of limitation do not run against the State, with respect to purely public rights, unless expressly included within the terms of the statute. Neither these authorities, nor those from other jurisdictions relied upon by defendant, purport to hold that a governmental body is under no obligation to perform its contracts. On the contrary, the rule is well established that a municipal corporation, so far as the performance of its contracts is concerned, and unless its charter clearly provides to the contrary, must abide by its contractual obligations. (*Chalstran* v. *Board of Education,* 244 Ill. 470; *City of Quincy* v. *Bull,* 106 id. 337.) As this court pertinently observed in the case last cited: "Where there is power to make a contract, there is power to make one that shall bind. We see no more to be involved here than the simple law of contract,—whether a municipal corporation may at its will repudiate the obligation of a fair contract which it has made, and which it was authorized to make. * * * The city must be bound by the contract and grant it has made, and had authority to make, the same as would an individual."

Defendant insists, however, that a municipal corporation may change its plans for a public improvement, after

obtaining the property for such improvement, if public needs so require, and to meet changed conditions. The tenth section of article 1 of the Federal constitution prohibiting the States from passing any law impairing the obligation of contracts applies to governmental action by municipalities. (*Mercantile Trust Co.* v. *Columbus*, 203 U. S. 311.) It follows that, to the extent defendant exercises governmental functions, it is precluded from repudiating its contracts. In the present case, as a party to the contract which plaintiffs seek to rescind, defendant was not, as a matter of fact, exercising its governmental functions. In this contractual relationship, it stands in precisely the same position as any individual who has contracted to acquire riparian rights and agreed to pay a stated consideration for their conveyance.

Defendant urges, further, that plaintiffs' retention of certain benefits of the contract in controversy and of the part of the decree of the circuit court rendered in 1913 establishing the boundary line is a bar to their action. Where the consideration for the transfer of real estate, as here, is an improvement of the property calculated to benefit neighboring land retained by the grantor, and the grantee fails to improve it, as agreed, rescission by the grantor is justified. (1 Black on Rescission (2d ed.), sec. 196, p. 549.) There can be no question as to the failure of commissioners of Lincoln Park and their successor, the defendant, to construct the parkway according to the provisions of the contract with plaintiffs' predecessors in title. It is equally apparent that, in 1931, the adoption of a different plan was in effect a repudiation of the earlier plan. We find it difficult to conceive of a stronger factual situation supporting a decree of rescission. The argument that plaintiffs have obtained benefits from the decree establishing a permanent boundary line between their property and the proposed park (even now submerged under the waters of Lake Michigan) is not well taken. The decree rendered in 1913 ascertaining and fixing the east boundary line of plaintiffs'

property did not, nor purport to, grant plaintiffs' predecessors in title any property rights they did not already own. It merely determined the correct location of the true boundary line,—nothing more nor less.

Asserting that the plaintiffs' action was prematurely brought, defendant maintains that if a cause of action is available to them it is one for damages after the improvement is constructed, if ever, and not for the rescission of the contract. *Doane* v. *Lake Street Elevated Railroad Co.* 165 Ill. 510, and *Truesdale* v. *Peoria Grape Sugar Co.* 101 id. 561, are relied upon by defendant. In the first case, the city council had authorized the building of an elevated railroad on Lake street in Chicago. Plaintiff Doane, an abutting property owner, attempted to enjoin its construction. In the second case, plaintiff Truesdale and others sought to restrain the defendant from laying a side-track in the street in front of its own property, to connect with any railroad previously constructed in the street. Plaintiffs' property was in the vicinity, on the same street, but not adjacent to the proposed improvement. Neither of these cases holding that the respective plaintiffs had a complete remedy at law by an action for damages is analogous to the case at bar where real property was conveyed on the expressed condition and stipulation that a parkway be constructed conforming to a specified plan. Damage here, as to plaintiffs' property in *Robbins* v. *Lincoln Park Comrs. supra,* resulting from the departure from the 1895 plan is entirely too speculative for determination of an action at law.

Defendant also insists that plaintiffs are guilty of *laches* and, consequently, not entitled to maintain their action. This argument rests upon the premise that plaintiffs failed to prevent the commissioners of Lincoln Park from departing from the construction shown in the 1895 plan at points south of Foster avenue, and a mile and a half from plaintiffs' property. Apart from the fact that the defense of *laches* is glaringly inconsistent with the defense that the

action was prematurely brought, it is without a basis. We have not only a material but an express repudiation of the contract by the commissioners established by the adoption of a new and different plan in 1931. Consideration for the contract of June 12, 1912, has wholly failed. Nor does defendant explain how it has been prejudiced by the alleged delay of plaintiffs in instituting their action, and we do not perceive any equitable basis for invoking the doctrine of *laches*. Indeed, it would be manifestly unjust and harsh to refuse redress to plaintiffs. Section 1 of the Statute of Limitations (Ill. Rev. Stat. 1939, chap. 83, par. 1, p. 1993) fixes twenty years as the period for bringing actions for the recovery of lands after the right to bring such action first accrued, and section 16 provides that actions on written contracts shall be commenced within ten years next after the cause of action accrued. In fixing the period in which rights and claims will be barred by *laches* equity follows the law, and, as a general rule, courts of equity will adopt the period of limitation fixed by statute. Plaintiffs' rights are not barred by the Statute of Limitations and, unless their conduct or special circumstances make it inequitable to grant them relief, they are not barred by *laches*. (*Andrews* v. *Floyd*, 308 Ill. 559; *Thomas* v. *Chapin*, 274 id. 95.) The fact that plaintiffs did not elect to avail themselves of the earlier departures by defendant from the 1895 plan incident to improvements at points several miles from their property,—departures in no way injuring them,—does not preclude the exercise of their right to rescind the contract which accrued in 1931 when defendant abandoned the original plan and adopted, instead, a plan prejudicial to them. As was well said in *Minneapolis* v. *Minneapolis Street Railway Co.* 215 U. S. 417: "Acquiscence in a regulation which may not have been deemed injurious, and may have been deemed wise and expedient, does not preclude a contest against the enforcement of regulations which are injurious and violative of contract rights." Plaintiffs

brought this action in 1937. Neither their conduct nor special circumstances render rescission of the contract of 1912 inequitable. *Laches,* it follows, is not a bar to their action.

Defendant complains that evidence as to the damage done to plaintiffs' property in 1929 and 1938 was inadmissible, pointing out that the contract affords no protection against storm damage. . Reliance is placed upon the provision in the contract of 1912 that the permanent boundary line "shall not be affected or changed thereafter either by accretion or erosion." The quoted provision did not release the commissioners from their obligation to execute the 1895 plan. Furthermore, defendant is mistaken in ascribing the damage done to plaintiffs' property as erosion. The evidence discloses that a severe storm in 1929 "broke up the breakwaters and everything." Exhibits in the form of pictures disclose the havoc and destruction wrought. This destruction of land was an avulsion, (*City of Chicago* v. *Ward,* 169 Ill. 392)—not a gradual wearing away by erosion. An avulsion, it is settled, does not change the boundary line, irrespective of contractual provisions. (6 Corpus Juris, (Avulsion) p. 876, note 62 (c).) It is apparent that had the 1895 plan been executed prior to 1929, the damage to the sea wall would not have been suffered, and the expense incident to its repair would not have been incurred.

Finally, defendant claims it cannot lawfully expend money for the park development opposite plaintiffs' property because of constitutional limitations upon the amount of indebtedness which it may incur. Section 12 of article 9 of our constitution is not, and has not been, a bar to the improvement. By section 4, 5 and 6 of the Submerged Land act of 1895 the commissioners of Lincoln Park were directed to levy a special assessment to cover the cost of the acquisition of riparian rights and the improvement itself. A municipal obligation created by a special assessment upon property benefited by the proposed improvement conform-

ing to the 1895 plan would not have been a debt within the contemplation of the constitutional limitation. (*People v. Honeywell,* 258 Ill. 319; *Jacksonville Railway Co.* v. *City of Jacksonville,* 114 id. 562.) It is sufficient to observe, in answer to defendants' plea of its financial inability to perform the contract, that neither financial distress nor insolvency is an excuse for its breach of contract in this case. Its financial inability to perform the contract, if such is the fact, merely strengthens plaintiffs' claim for rescission owing to a failure of consideration and, consequently, the decree rendered in their favor.

The decree of the circuit court is right, and it is affirmed.

*Decree affirmed.*

Mr. JUSTICE SHAW, specially concurring: I agree with the result reached in this opinion but not with all the reasoning thereof.