DONALD PETERS *et al.*, Plaintiffs-Appellants, *v.* HEALTH AND HOSPITALS GOVERNING COMMISSION OF COOK COUNTY *et al.*, Defendants-Appellees.

First District (2nd Division)    Nos. 80-1448, 80-1629 cons.

Opinion filed December 22, 1980.

Lester Asher, Marvin Gittler, and Joel A. D'Alba, all of Chicago (Asher, Goodstein, Pavalon, Gittler, Greenfield & Segall, Ltd., of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Jr., Deputy State's Attorney, and John A. Dienner, III, Assistant State's Attorney, of counsel), for appellees.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

In consolidated appeals, plaintiffs, union officers of two different unions and their unions, appeal from dismissal of their separate complaints which sought specific performance of their individual collective bargaining election agreements in actions before two different chancellors in separate proceedings. They identify the issues on appeal as whether an election agreement with a public employer purporting to create collective bargaining obligations, which assertedly terminate upon certain events, can be enforced when neither event has occurred; and, whether a public employer succeeding to the rights, duties and obligations negotiated by its predecessor, another public employer, is obligated to comply with the terms of that collective bargaining agreement. The issues must be determined in the affirmative for the reasons set forth below, and the orders of dismissal are reversed.

Plaintiffs in case No. 80-1448 are Donald Peters and Robert Simpson, individually, and as president and recording secretary, respectively, of the Warehouse, Mail Order, Office, Technical and Professional Employees, Local 743, International Brotherhood of Teamsters ("Local 743" and, alternatively, "union"). In case No. 80-1629 plaintiffs are Donald Peters and Irving Kurasch, individually, and as president and secretary-treasurer, respectively, of the Hospital Employees Labor Program of Metropolitan Chicago ("H.E.L.P!" and, alternatively, "union"). Defendants in each case are Health and Hospitals Governing Commission of Cook County ("Commission") and the Board of Commissioners of Cook County ("County Board").

From the facts set forth in the respective verified complaints, which for the purposes of the motions to dismiss must be deemed true, together

with all reasonable inferences which may be drawn therefrom (*Browder v. Hanley Dawson Cadillac Co.* (1978), 62 Ill. App. 3d 623, 379 N.E.2d 1206; *Chicago Teachers Union v. Board of Education* (1973), 14 Ill. App. 3d 154, 301 N.E.2d 833), it appears that on August 6, 1971, Local 743 and the Commission, which had been established in 1969 pursuant to statute (Ill. Rev. Stat. 1969, ch. 34, par. 5011 *et seq.*), signed a collective bargaining agreement providing for an election by secret ballot to determine whether a majority of the Commission's security officers employed at Cook County Hospital chose to be represented by that union. The election was won by Local 743, which since that time has continuously represented those officers for the purpose of negotiating wages, hours and working conditions and administering the collective bargaining agreement. Three consecutive 3-year agreements were so negotiated and administered, the last one expiring in December 1979 by its own terms.

On November 30, 1979, by statute (Ill. Rev. Stat., 1979 Supp., ch. 34, par. 5020), the County Board assumed control of and was authorized to exercise all rights, duties and powers which theretofore had been exercised by the Commission. The County Board, however, refused to negotiate with Local 743 with regard to any further collective bargaining agreements. This refusal precipitated the suit for specific performance in No. 80-1448, which was filed on March 26, 1980.

In No. 80-1629, an election was held pursuant to agreement between the Commission and H.E.L.P! in May 1979, this time involving the question of whether a majority of the Commission's Cook County and Oak Forest Hospitals' technical employees wished to have H.E.L.P! represent them. The secret ballot election held on June 13, 1979, resulted in H.E.L.P!'s having been so chosen. Between August and November 1979 the Commission and H.E.L.P! embarked upon negotiations concerning wages, hours and working conditions resulting in agreement to certain items and leaving others for further negotiation. After December 1, 1979, the County Board refused to continue those negotiations, and refused to submit the impasse to arbitration. H.E.L.P! thereafter, on April 2, 1980, filed its complaint for specific performance.

The election agreements in each case provided that if the unions establish through the elections that they represent a majority of the employees covered in each agreement, the Commission will bargain in good faith concerning wages, hours and working conditions, in exchange for the unions' agreements not to strike or permit slowdowns, work stoppages or picketing during any term of such an agreement or pending resolution of collective bargaining negotiations. Where disagreement between the Commission and the unions should ensue after a reasonable period of negotiations, either party is given the right to refer unresolved matters to a fact finder to be selected by the parties or through the

American Arbitration Association. The election agreement itself, in each case, thus contains the respective rights and obligations of the parties to negotiate and bargain in good faith for subsequent agreements which would govern the actual wages, hours and work conditions. Neither requires that a contract actually be consummated as to these factors. No specific termination date was provided in either election agreement.

Each complaint prayed for specific performance of the agreement therein involved, for an order compelling the County Board to bargain in good faith and to submit unresolved issues to an impartial fact finder. The motions to dismiss filed by the County Board were granted in each case, from which each appeal proceeds, consolidated in this court because of the similarity of the issues to be resolved.

## I.

The principal issue centers around the language of the election agreements insofar as they provide, as the unions claim, or fail to provide, as the County Board claims, any recognizable bases for termination. If they do, they may be deemed sufficiently definite to support the proposed actions for specific performance. If not, they may be regarded as perpetual in duration and, therefore, under Illinois law, terminable at will. (*Joliet Bottling Co. v. Joliet Citizens' Brewing Co.* (1912), 254 Ill. 215, 98 N.E. 263; *Donahue v. Rockford Showcase & Fixture Co.* (1967), 87 Ill. App. 2d 47, 230 N.E.2d 278; *Schoen v. Caterpillar Tractor Co.* (1968), 103 Ill. App. 2d 197, 243 N.E.2d 31.) An agreement construed by the parties as possessing cognizable events upon which termination may occur, however, is not perpetual and terminable at will and will be upheld even in the absence of a specified termination date. *Consolidated Laboratories, Inc. v. Shandon Scientific Co.* (7th Cir. 1969), 413 F.2d 208; *Donahue v. Rockford Showcase & Fixture Co.*; *W. P. Iverson & Co. v. Dunham Manufacturing Co.* (1958), 18 Ill. App. 2d 404, 152 N.E.2d 615.

The unions contend that the agreements' primary obligations to bargain in good faith and refrain from economic actions contain ascertainable termination points upon the occurrence of either of two events: (1) the failure of the parties to comply with an arbitration award; or (2) the unions' loss of status as representatives of majorities of the affected employees.[1] The County Board denies that either of those events constitutes a termination point and claims that no termination event actually exists or can be identified in the election agreements. We disagree.

---

[1] The majority status could be tested, under the agreements, by employees' actions seeking to decertify the unions or by the Commission, if it had objective evidence upon which to question the unions' majority position. The latter action could be sought by the Commission either upon termination of a collective bargaining agreement or one year from the date the union had been certified. If a union lost an election by reason of an employees' or the Commission's action, the obligation to bargain with it would thereby end.

■■ The County Board's contention is based upon the fact that the termination point of noncompliance with an arbitrator's decision contains within it only an option to terminate the agreement. Therefore, it reasons, an aggrieved party may choose to overlook this refusal to comply with the arbitrator's decision and elect to continue the relationship, thereby preventing this provision from ever operating as an authentic termination event. No authority is cited in support of this proposition. An option to cancel, however, does not necessarily destroy mutuality of obligation or the validity of a contract. (*Peck v. Stafford Flower Mills Co.* (8th Cir. 1923), 289 F. 43, 45; *Mayo v. American Malting Co.* (4th Cir. 1914), 211 F. 945; *W. P. Iverson & Co. v. Dunham Manfacturing. Co.*) Arguments to the effect that options may never be exercised when breaches occur sink into the same conjectural quicksand as assertions that breaches themselves may never occur. Such speculative assumptions cannot obscure the presence of otherwise ascertainable points of termination, particularly where, as here, the option to cancel is conditioned upon a voluntary act of the other party. 1A Corbin, Contracts §165 (1963).

■■ The County Board also disputes the validity of the loss of union majority representation as an ascertainable point of termination, claiming that this is an event over which neither party has any control, citing *Consolidated Laboratories, Inc. v. Shandon Scientific Co.*, which held that the contract there was not for an indefinite period of time because it was "* * * terminable upon the occurrence of the two specified events, both of which are in the sole control of [the defendants]." (413 F.2d 209, 212.) From this language, the County Board infers that absent control by either the union or the County Board of the events in the instant contracts, no legitimate termination event is here presented. Control of termination events by either party has not been deemed requisite to the avoidance of terminable at will contract status, however. For example, in *Stein v. Isse Koch & Co.* (1953), 350 Ill. App. 171, 112 N.E.2d 491, the terminable event was that plaintiff's discharge from the army, over which neither party had control. In *Donahue v. Rockford Showcase & Fixture Co.*, the terminable event was the declination of "shipments" generated by the salesman's orders to a level below $25,000 in any one year, which was not controllable by either party. And in *In re Commodity Merchants, Inc.* (7th Cir. 1976), 538 F.2d 1260, 1263, the "unsatisfactory financial condition" of a trader's customer was identified as a termination point, determinable by reference to commercial standards. See, *e.g.*, Ill. Rev. Stat. 1975, ch. 26, par. 2—609.

The preceding result would be the same even if it were to be assumed, *arguendo*, that control is a necessity. Union involvement in labor relations is more than simply winning an initial representation election. Such organizations typically must continue their efforts to main-

tain their majority status by providing adequate representational services during grievance procedures, protesting discharges and presenting persuasive programs with respect to wages, hours and conditions of work. To the extent that a union fulfills, or fails to meet such obligations, it may be argued, as the unions do in this case, that it "controls" its right to continue representation since its failure to do so can result in decertification proceedings under the contracts, which may be initiated by its membership or by the employer. An analogy to such a circumstance can be made to the requirement that a business maintain its existence (*W. P. Iverson & Co. v. Dunham Manufacturing Co.*), or continue to market its products (*Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc.* (S.D.N.Y. 1959), 178 F. Supp. 655, *aff'd* (2d Cir. 1960), 280 F.2d 197, and cases therein collected). It is true that the unions, acting rationally in their own best interests, as well as in the interests of those it represents, can be expected to adequately represent its membership just as a business marketing a product upon which it pays royalties can be expected to continue to do so; yet, they may also fail for a number of reasons, including lack of ability, capacity or need, which will result in termination of the contract.

From the foregoing we conclude that refusal to abide by an arbitrator's decision, notwithstanding the option to continue the relationship in the face of such refusal, and the lack of union majority representation, are sufficiently cognizable termination events so as to remove the contracts involved in the present cases from the indefiniteness characteristic of contracts in perpetuity and terminable at will.

## II.

The unions next argue that the obligations of the Commission became the obligations of the County Board, relying upon section 10 of the County Hospitals Act (Ill. Rev. Stat., 1979 Supp., ch. 34, par. 5020, effective November 30, 1979). That provision, in pertinent part, reads as follows:

> "The Board of Commissioners shall have and exercise all rights, powers and duties heretofore exercised by the Commission. All books, records, papers, documents, property, real and personal, unexpended appropriations and pending business in any way pertaining to the rights, powers and duties of the Commission shall be transferred and delivered to the Board of Commissioners. All rights, duties and obligations of the Commission shall become the rights, duties and obligations of the Board of Commissioners."

Included among the "rights, duties and obligations" assumed by the County Board, it is maintained, are those contained in the collective bargaining election agreements negotiated by the Commission. Because the Commission had the legal authority to enter into such contracts, the

unions contend, citing *Tobin v. Health & Hospitals Governing Com.* (1978), 66 Ill. App. 3d 564, 384 N.E.2d 77, which obligated the Commission to bargain in good faith with the unions concerning wages, hours and working conditions, by operation of statute those obligations have been transferred to the County Board. The unions rely upon *People ex rel. Housing Authority v. Hursey* (1956), 7 Ill. 2d 537, 131 N.E.2d 483, and claim the same rights against the County Board and remedies available to them by reason thereof as they possessed in relation to the Commission.

The County Board counters with the contention that it has the unequivocal right to refuse to enter into collective bargaining agreements with its employees, relying upon section 2(2) of the National Labor Relations Act, as amended (29 U.S.C. §152(2) (1976)). (*Abood v. Detroit Board of Education* (1977), 431 U.S. 209, 52 L. Ed. 2d 261, 97 S. Ct. 1782; *City of Chicago v. Confederation of Police* (1976), 427 U.S. 902, 42 L. Ed. 2d 1192, 96 S. Ct. 3186.) The County Board asserts that to force it to bargain collectively against its decision not to do so is contrary to public policy. It reads *Tobin v. Health & Hospitals Governing Com.* as recognizing the County Board's right to exercise its official judgment and discretion in such matters. Since it chooses to exercise that judgment and discretion in this case by refusing to bargain with the unions, the County Board maintains that a decision requiring it to do so would be an abridgement of its rights granted to it under its charter. We cannot agree.

■■ The statutory language transferring jurisdiction of County Hospital affairs from the Commission to the County Board is clear, unambiguous and unequivocal. The terms "rights, duties and obligations" to be "transferred and delivered to the Board of Commissioners," require no legalistic gymnastics in order to construe them to include those which emanate from a contract. The supreme court in *People ex rel. Housing Authority v. Hursey* construed statutory language requiring the "* * * turn over of all its property and obligations * * *" (Ill. Rev. Stat. 1953, ch. 67½, par. 17(b)(2)) as meaning "[u]nder such circumstances, any person with contract rights against the County Authority [the transferor] would have the same rights against the successor City Authority [the transferee], with the same remedial rights and the same property interests and credit supporting the contract." (7 Ill. 2d 537, 544.) Similarly, by virtue of section 10 in the present case, the unions have been given the same contractual rights against the County Board, together with the same remedies, as they would have had against the Commission.

Further, the circumstances presented in this case are little different, with respect to residual rights and obligations, from those presented by a merger of two or more other types of governmental units, in which case the general rule provides that existing contracts and indebtedness of the unit to be annexed become the contracts and indebtedness of the

surviving unit, unless otherwise provided by statute. (*People ex rel. Moore v. Chicago, Burlington & Quincy R.R. Co.* (1953), 414 Ill. 419, 429, 111 N.E.2d 509; *Kocsis v. Chicago Park District* (1935), 362 Ill. 24, 198 N.E. 847.) There is no suggestion in the language of section 10 that the general rule should not be followed in the case at bar. Units of government have been compelled to abide by their contractual obligations notwithstanding public policy discretionary powers which initially might have been exercised in other ways under different circumstances. (*Arlington Heights National Bank v. Village of Arlington Heights* (1965), 33 Ill. 2d 557, 213 N.E.2d 264; *Wall v. Chicago Park District* (1941), 378 Ill. 81, 37 N.E.2d 752; *Chalstran v. Board of Education* (1910), 244 Ill. 470, 91 N.E. 712.) Our ruling in no way interferes with discretionary public policy decisions to be made with regard to this subject area when exercised by the County Board *ab initio. Tobin v. Health and Hospitals Governing Com.*

The remaining arguments relative to constitutional prohibitions against impairment of contracts need not be considered in view of the result mandated by the foregoing discussion. The dismissals of the complaints and actions seeking specific performance were in error and must be reversed and remanded for further proceedings consistent with the views herein expressed.

Reversed and remanded.

STAMOS and DOWNING, JJ., concur.