JOSEPH A. COURI, Plaintiff-Appellee and Cross-Appellant, *v.* ANTHONY J. COURI, Defendant-Appellant and Cross-Appellee.

Third District    No. 81-163

Opinion filed January 28, 1982.

John E. Cassidy, Jr., of Cassidy, Cassidy, Mueller & Price, of Peoria, for appellant.

David B. Daley, of Sutkowski & Washkuhn, Assoc., of Peoria, for appellee.

JUSTICE HEIPLE delivered the opinion of the court:

The plaintiff, Joseph Couri, and his brother, Anthony Couri, the defendant, jointly operated the Couri Brothers Supermarket. Plaintiff sought an accounting from the defendant for his share of that business. The trial court ordered Anthony Couri to pay $122,690 and convey his

interest in a tract of real property to plaintiff. Defendant appeals. Joseph Couri cross-appeals, seeking to increase the amount of the judgment.

The business agreement, or lack thereof, which is the genesis of this controversy spans two generations. This cause, transpiring over almost a decade, consumed the services of several firms of attorneys and two judges. As are many causes involving disgruntled siblings who seek to resolve their economic differences in court, this action has featured uncompromising enmity. The facts follow.

The Couri family opened their supermarket on December 22, 1928, in Peoria. It was a family run business. Everyone helped out. Defendant began working full-time in 1931, a year out of high school: plaintiff worked full-time beginning in 1935. In 1938 the parties' father left the business due to poor health. He died two years later. Anthony, Joseph, and Peter Couri, all brothers, opened the Couri Brothers Supermarket in 1941. They agreed to share equally in the control of the enterprise and its profits and losses for an indefinite period. The agreement was not memorialized by a writing.

Between 1941 and 1946 Joseph Couri was in the United States Army. Upon return, he began working in the store and resided above it with his mother and other family members including the defendant. From 1947 to 1956, Anthony Couri opened, operated; and eventually sold, as a partner with another, a tavern known as the Western Tap. Then, Peter Couri decided to attend medical school. In 1954, Joseph and Anthony Couri purchased in equal shares Peter's interest in the supermarket. Operation of the store was not curtailed. In 1958, Anthony and Joseph apparently decided to sell the business to their cousins. The deal fell through.

In September 1973, Joseph Couri left the store with the resolution of dissolving the partnership with his brother. Thereafter, defendant changed the locks on the doors and reopened the same business as Couri's Supermarket. In June 1980, a court-appointed receiver wound up the affairs of Couri Brothers Supermarket.

The partnership's bookkeeping is unintelligible and inconsistent with acceptable accounting practices. At the end of each business day a daily report was prepared by each grocery checker. The elements of this report consisted of gross receipts less cash paid out for expenses. In short, the figure represented cash on hand at the end of the day, or at least should have. It seems that large expenses often were paid out by check during the day and such disbursements would be deducted from gross receipts. Also, the partners' draws were taken directly from the register. Prior to 1959 no accounting existed for such draws. After 1959 each partner took what he needed and put a chit in the register with his name and the amount taken. The accuracy of this procedure, or that it was even

followed, is somewhat dubious since plaintiff did not make a draw according to it until 1962.

Each month these daily reports were compiled in a monthly summary and thereafter a yearly report. The latter two reports were used for sales tax and federal income tax reporting. The defendant was responsible for these records except from 1947 to 1956 when his sister, Gladys Couri, prepared the daily reports. The defendant for the most part was responsible for depositing the cash receipts of the business. Plaintiff did the store's ordering, paid employees, and often toiled as a butcher in the meat department.

After plaintiff decided to dissolve the partnership in September 1973, he went to settle his differences at defendant's home. They agreed that in the previous 14 years that defendant had overdrawn from the business approximately $88,000 more than plaintiff. Since Joseph Couri wanted to sell the business he requested the account books for the prior two years. Defendant gave him the yearly books and told him he would get the "other figures." These latter totals represented a different set of accounts for the business. In any event, settlement could not be reached as to Joseph Couri's share of the partnership. This petition for an accounting resulted.

Six years of litigation and over a dozen hearings later, the trial court decided the case. It concluded that defendant's calculation of store income of $546,143 was wrong. Instead, the trial judge found that between January 1, 1957 and June 30, 1980, the partnership's income was $750,000. Accordingly, defendant was ordered to pay plaintiff $122,690 based on the difference in the brothers' respective draws from the business and the assets of the partnership.

As could be expected, both parties were dissatisfied, and appeal to this court. Plaintiff claims the accounting is inadequate and should be increased to $327,440 since the partnership's gross profits were $1,094,500 from 1957 to 1980. Also, he contends, Anthony Couri was not entitled to $65,000 compensation as a partnership employee after the partnership was dissolved and before it was wound up on June 30, 1980. Defendant cross-appeals, arguing in the alternative that the judgment be reduced or the cause dismissed.

■■ The initial prerequisite for maintaining a suit for an equitable accounting, as opposed to suing in law on an account, is the absence of an adequate legal remedy. The issues this cause presents is nothing more than an unsettled claim by one person against another. In conventional parlance, a debt is allegedly owed. For such a wrong a legal remedy has long been recognized in this State. *Garrity v. Hamburger Co.* (1891), 136 Ill. 499, 509.

■■ Nevertheless, the fact this action is cognizable at law does not signify the sufficiency of any legal remedy that could be obtained. Given the length of this partnership and the fiscal accounting spectacle of the business, we agree with the trial judge that any legal remedy would amount to nothing more than an uncollectible chose in action. Notwithstanding, the existence or absence of mutual accounts of the parties, as well as the duty of the defendant to account to plaintiff, we cannot agree that fashioning an equitable decree is possible. Therefore, we reverse the decision of the trial court and dismiss the bill for want of equity.

Generally, to obtain an accounting in equity, plaintiff must establish the existence of a fiduciary relationship between him and the person required to account, a need for discovery, and the existence of mutual accounts which are of a complex nature. (*Ely v. King-Richardson Co.* (1914), 265 Ill. 148, 152.) Yet a duty to perform an act is nothing less than futile if what is requested cannot be done. In other words, the defendant cannot be made to account where no evidence exists from which such reckoning can be made.

Both parties agreed that how much income the partnership received from its incipiency until liquidation could be verified reliably from the "daily reports." Such a concession is open to considerable doubt since those reports resulted in only a cash total for each day tabulated. Such figures did not incorporate any balancing from day to day, nor provide figures for cost of goods sold or merchandise sold on credit, even if their method of computation was precise. We have the credit accounts before us. Such records, which plaintiff kept, were inscribed on the backings of cigarette cartons and cracker boxes. They are undated and consist of a name, no address and various amounts. Additionally, over a 20-year period (1955-1975), slightly more than half of such fundamental business records as the business' checking account statements are in the record. Nor prior to 1959 is any recordkeeping system in evidence as to the respective draws each partner took from the business. Money was taken from the till when needed.

The daily reports, which were restated in the monthly summaries and the yearly books, were destroyed two years after the filing of the instant suit. One of the defendant's children, on the urgings of his mother, cleaned out the garage and the attic of defendant's home while the rest of the family was on vacation. The records were in the attic. Thus, with the destruction of the records, even the question of their dubious trustworthiness has become irrelevant.

Accordingly, the parties attempted to re-create or manufacture those records. The defendant submitted the partnership's tax returns. From 1957 through 1973 the defendant produced 10 or 11 returns, the others having been lost or destroyed. The validity of these returns is highly

improbable. Defendant apparently kept two sets of books for the partnership. One represented an actual depiction of the business while the other set was used for tax purposes. The latter books misstated income so that tax liability would be reduced. Quite simply, it's anybody's guess what the business took in. The net income from the store for 1974-1980 was computed from the defendant's personal income tax returns. Also, the parties submitted affidavits indicating their calculations as to what the income of the business was from 1957-1980. Defendant indicated the business generated $546,143 in income during such period. His conclusion was not supported by any schedules. Plaintiff, based on compilations made by his nephew, a certified accountant, testified that total payouts made by the partnership were $666,647. Plaintiff contends the imputed net income of the business during this time was $1,442,000. No method existed to verify the draws of either party other than their recollections. The accountant's report had been based on the suspect partnership tax returns, affidavits by each party, and various amounts paid by the partnership to financial institutions concerning other real estate purchases by the brothers. The accountant admitted he had no idea whether any of the reports were correct. The trial court ruled the actual net income of the grocery store for the years 1957 to June 30, 1980, was $750,000. This figure was the basis for calculating plaintiff's award.

■■ The findings of a trial judge will not be disturbed unless against the manifest weight of the evidence. Where the record, however, is barren of evidence to support the trial judge's decision, a judgment based on such decision cannot stand. The record fails to reveal any facts which support the trial judge's conclusion, or his method of computation, that $750,000 was the actual net income of the business over the relevant period. The figure was pure guesswork, perhaps motivated by the trial court's propensity to end an interminable dispute rather than state with certainty an amount actually owed. Although justice is not an exact science, neither can judicial remedies be formed from arbitrary reasoning or calculations. Because plaintiff's award was based on the trial court's determination of the business' actual net income, the judgment which was the result of such erroneous calculation is equally wrong.

An accounting cannot be formulated because the data necessary for such a computation has been destroyed. Although the records from 1971-75 are arguably complete to make some type of accounting, most of the figures the records provide are misstatements. Defendant testified that he understood business income as well as the cost of goods sold during that period. Although the parties have made an effort to extrapolate the truth by re-creating such records, their effort is infected by supposition and hypothesis. Neither is a suitable benchmark for judicial decision-making.

Plaintiff argues that due to the large amount of payouts made by the

partnership or the defendant between 1957-1980, it can be determined what income was necessary to make such payments. The infirmity of this reasoning is the fact that both parties had considerable real estate investments as tenants in common which were separate ventures from the supermarket partnership. Such purchases occurred over the life of the partnership, and the business served as the vehicle through which payment was made on the various financing arrangements on these properties. Also, Anthony Couri's statement that his draws exceeded his brother's by $88,000 is nothing more than a fact. Because he withdrew more does not mean he was not entitled to do so. Maybe he had it coming. Perhaps the money was spent on the real estate ventures. Nobody can tell. Over the 37 years the partnership existed, half of that time no system existed of measuring draws against the partnership assets.

■■ We recognize defendant had a duty to account to plaintiff concerning the parties' respective shares. In other words, he had the burden of production. Where no accounts exist it is impossible to say how much is due one party or the other. Nonetheless, defendant's inability to produce does not relieve plaintiff of the ultimate burden of persuasion on the issue of the amount of his share. (*Fineman v. Goldberg* (1928), 319 Ill. 507, 512.) Attempting to make records or manufacture evidence will not suffice. Once the daily reports were innocuously swept away by a teenager obeying his parent, the accounting for this partnership became not only impracticable, but unattainable. The myriad exhibits, the voluminous, often rambling transcript, and the speculation of the trial judge groping for a resolution, make this abundantly evident.

For the reasons stated, we reverse the judgment of the Circuit Court of Peoria County and dismiss the petition for an accounting.

Reversed.

BARRY and STOUDER, JJ., concur.