**FIRST COMMODITY TRADERS, INC., Plaintiff,**

v.

**HEINOLD COMMODITIES, INC. and Vern Pherson, Defendants.**

**No. 81 C 5757.**

United States District Court, N.D. Illinois, E.D.

April 11, 1984.

Sidney L. Rosenfeld, Belle Lind Gordon, Solomon, Rosenfeld, Elliott, Stiefel & Glovka, Chicago, Ill., for plaintiff.

William J. Nissen, Sidley & Austin, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This diversity action is before the court on defendants' motion for summary judgment on Counts I through IX of plaintiff's eleven-count First Amended Complaint. For the reasons stated below, the court grants defendants' motion.

The three principals of plaintiff First Commodity Traders, Inc. ("FCT") are Robert Gardner, Bruce Zins, and Robert Blankoph (collectively "GZB").[1] Before incorporating FCT, GZB were principals of a New York brokerage firm. GZB apparently did not have a sufficient capital base to support all the commodities trading business they were able to generate, and they proposed an arrangement with defendant Heinold Commodities, Inc. Heinold had enough capital to support the business GZB could generate in New York, and an agreement was reached under which GZB would bring customers to Heinold and service those customers for Heinold, with Heinold and GZB dividing the commissions. GZB thereafter formed FCT, which assumed GZB's role in the relationship with Heinold,

pursuant to a Corporate Branch Office Agreement ("Agreement") entered into by Heinold and FCT.

In January 1981 Heinold notified FCT of its intention to terminate the Agreement, and this termination was effected in March 1981. FCT's position is that Heinold deliberately chose to terminate the Agreement at a time when more stringent capital requirements were about to be introduced, so that FCT would find it impossible to transfer customers from Heinold to some other large firms with sufficient capital. In this manner, FCT charges, Heinold was able to retain the customers brought to it by FCT, without continuing to divide commissions with FCT. FCT alleges that defendant Vern Pherson, manager of Heinold's New York office, orchestrated Heinold's termination of the Agreement.

Counts I through III relate to the termination of the Agreement. Counts IV through X relate to disputes that arose before termination. Count XI seeks attorney fees and costs under the Agreement. Pherson is named only in Count III.

### Jurisdiction and Choice of Law

FCT brought this lawsuit in the Supreme Court of the State of New York. Heinold removed, on the basis of diversity, to the United States District Court for the Southern District of New York, and that court transferred the case to this court, pursuant to the parties' agreement. On December 12, 1983 this court directed Heinold to show cause why the case should not be remanded to the Supreme Court of the State of New York. Heinold, FCT, and Pherson have submitted memoranda in support of removal jurisdiction, and the court is persuaded that removal was proper. Heinold's removal petition discloses that at the time of removal FCT was a citizen of New Jersey, Heinold was a citizen of Delaware and Illinois, and Pherson was a citizen of New Jersey. Since FCT and Pherson both were citizens of New Jersey,

1. Gardner, Zins, and Blankoph are parties to this action, as Heinold has named them individually in its counterclaim.

there was not complete diversity as required by 28 U.S.C. § 1332. As Heinold and FCT argue, Count III of the original complaint, seeking an accounting from Heinold, would have been removable if sued upon alone, and was separate and independent from the counts relating to termination, one of which named Pherson.[2] Heinold therefore was entitled to remove the entire action under 28 U.S.C. § 1441(c). Upon removal under § 1441(c), the district court may elect to retain the entire case, or it may elect to remand the matters that otherwise could not have been removed. The court elects to retain the entire case. The court need not pass upon Heinold's allegation that Pherson was joined as a sham defendant to defeat diversity.

■■■■ Because this case was transferred from the Southern District of New York, this court is bound to apply the choice of law rules applied by the courts of the State of New York. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 259 n. 8, 70 L.Ed.2d 419 (1981). The parties have argued all matters under Illinois law, and the court concurs in this choice of law. Paragraph 11 of the Agreement provides:

> This Agreement shall be interpreted and construed according to the laws of the State of Illinois, which shall govern the rights, obligations and liabilities of the parties hereto.

**2.** Similarly, Counts IV through X of the First Amended Complaint, asserted only against Heinold, are separate and independent from Counts I through III, Count III being asserted against both Heinold and Pherson. Count XI asserts no substantive claim, but instead seeks attorney fees under the Agreement, should FCT prevail on any of its substantive claims.

**3.** The court is aware of one New York case explicitly discussing whether contractual governing law provisions should be applied to related tort claims, and that case holds that they should not. *Knieriemen v. Bache Halsey Stuart Shields*, 74 A.D.2d 290, 427 N.Y.S.2d 10, 12–13, *appeals dismissed*, 50 N.Y.2d 1021, 410 N.E.2d 745, 431 N.Y.S.2d 812, 51 N.Y.2d 970, 416 N.E.2d 1055, 435 N.Y.S.2d 720 (1980). *Knieriemen* relies for this holding on a case which the court does not believe is a sound precedent. *Fantis Foods v. Standard Importing Co.*, 63

(First Amended Complaint, Ex. A.) New York courts honor such governing law provisions, so long as the transaction bears some reasonable relation to the state whose law is designated. *Gambar Enterprises, Inc. v. Kelly Services, Inc.*, 69 A.D.2d 297, 418 N.Y.S.2d 818 (1979); *see also* Gruson, *Governing Law Clauses in Commercial Agreements—New York's Approach*, 18 Colum.J. Transnat'l L. 323 (1980). The Agreement in this case bears a reasonable relation to Illinois, and the court will honor Paragraph 11. It should be noted that Count I (unjust enrichment) and Count III (tortious interference or other business tort) are not contract actions. The court believes it appropriate to apply Paragraph 11 to these counts, since they are closely related to the parties' contractual relationship.[3]

**Count II—Breach of Contract**

In Count II FCT alleges that Heinold's termination of the Agreement constituted a breach of contract. Heinold argues that the Agreement was terminable at will; if it was not terminable at will, Heinold also argues, termination was justified because FCT had breached the Agreement. The court accepts Heinold's arguments.

■■■■ Under Illinois law, a contract with no cognizable duration term is a contract terminable at will, by operation of law. *E.g., Mann v. Ben Tire Distributors, Ltd.*, 89 Ill.App.3d 695, 697, 44 Ill.Dec. 869, 870, 411 N.E.2d 1235, 1236 (4th Dist.1980).[4] A

A.D.2d 52, 406 N.Y.S.2d 763 (1978), *rev'd* 49 N.Y.2d 317, 402 N.E.2d 122, 425 N.Y.S.2d 783 (1980). In *Fantis* the court was considering a choice-of-forum clause, not a choice-of-law clause. Not only did it hold the clause inapplicable to a claim sounding in tort, but it also found grounds for not applying the clause even to a claim under the contract. In reversing, the court of Appeals neither approved nor disapproved the holding in question. The court is persuaded by the argument on this point of the dissenting Appellate Division Justices. *Cf. In re Oil Spill by Amoco Cadiz*, 659 F.2d 789, 794 (7th Cir.1981) (U.S. Arbitration Act). See also notes 15 and 16, *infra*.

**4.** FCT states that "there are exceptions to the 'at will' rule in Illinois" (FCT memo filed 9/26/83, p. 8), citing *P.S. & E. Inc. v. Selastomer Detroit, Inc.*, 470 F.2d 125 (7th Cir.1972). That case

duration term need not specify a date or a period of time; it can identify some event which will signal termination, even if it is not clear, ex ante, when that event will take place. *Peters v. Health and Hospitals Governing Commission*, 91 Ill.App.3d 1104, 47 Ill.Dec. 648, 415 N.E.2d 653 (1st Dist.1980), *rev'd on other grounds*, 88 Ill.2d 316, 58 Ill.Dec. 877, 430 N.E.2d 1128 (1981), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). Heinold's position is that the Agreement specifies no duration. FCT "contends that the agreement between the parties does contain a term. The parties agreed that the relationship would continue so long as it remained profitable ... and otherwise could be terminated only for cause." (FCT memo filed 9/26/83, p. 5.)

■ The language of the Agreement itself certainly is insufficient to support FCT's contention. FCT relies on two passages from the Agreement. The opening sentence of Paragraph 6 states:

Heinold shall pay compensation to [FCT] dependent upon the profitable operation of the branch office and the total cash and open trade equity of the branch.

Paragraph 17 states:

Either party may unilaterally terminate this Agreement for a breach of any of the paragraphs of this Agreement.

Paragraph 6 obviously is directed at defining FCT's compensation, and it does not suggest that profitability shall determine the duration of the Agreement. FCT argues that Paragraph 17 supports its position, because that paragraph would be superfluous in a contract terminable at will. The court agrees that Paragraph 17 arguably may indicate that the parties did not intend to create a contract terminable at will. In the absence of a cognizable duration term, however, a contract will be terminable at will *by operation of law*, whether or not that was the parties' specific intent.[5]

Heinold has argued persuasively that the court should not consider parol evidence in construing the Agreement, citing *Union Special Sewing Machine Co. v. Lockwood*, 110 Ill.App. 387 (1st Dist.1903). Even if parol evidence is considered, however, the court holds that FCT has not raised a genuine issue of material fact in support of its construction of the Agreement.

FCT relies on the following items of parol evidence. GZB's initial overture to Heinold was Gardner's July 1977 telephone call to Ralph Klopfenstein, president of Heinold. In the course of making his proposal, Gardner stated to Klopfenstein that GZB were seeking to find a permanent relationship with a major commodities firm to whom GZB could transfer all their business, and he said also that a permanent relationship with Heinold would be mutually beneficial. (Gardner aff. ¶ 2.) Gardner's affidavit also discusses some of the accounting disputes between FCT and Heinold. In this connection Gardner states:

We wished no quarrel with Heinold because we were delighted with the business arrangement and at no time considered that it was anything but permanent, so long as it remained profitable to Heinold. As a result we acquiesced in decisions made by Heinold from time to time which we considered unfair.

(Gardner aff. ¶ 6.)

After Gardner's phone conversation with Klopfenstein, Zins met with Klopfenstein and Robert Fivian, a Heinold employee, at Heinold's Chicago offices. Zins projected gross annual commissions in excess of $500,000 and net annual commissions in excess of $250,000. Zins states:

does not really enunciate an exception to the general rule that contracts with no cognizable duration term are terminable at will. *Selastomer* does allow recovery in some circumstances, and the court addresses this case in its discussion of Count I, FCT's unjust enrichment count, *infra*.

5. The court does not understand FCT to be arguing that Paragraph 17 itself constitutes a cognizable duration term, and the court doubts that Paragraph 17 could constitute a cognizable duration term. *See Gordon v. Matthew Bender & Co.*, 562 F.Supp. 1286, 1290–92 (N.D.Ill.1983) (Hart, J.).

I told Klopfenstein and Fivian that we desired a permanent relationship with Heinold in as much as we would be closing up our present corporation. Fivian stated ... the relationship would last so long as we were able to deliver net and gross commissions in quantities not less than our projections.... After the meeting and prior to September 1, 1977 I engaged in one or two telephone conversations with Fivian in the course of which Fivian stated that Heinold had decided to proceed on the basis of our discussions.

(Zins aff. ¶ 1.)

GZB began work as employees of Heinold, under a Memorandum of Understanding which was silent as to duration. (Gardner aff. ¶ 4, attach. 1.) FCT relies on Fivian's cover letter, transmitting a copy of the Memorandum, which included the sentence:

I look forward to you joining us here at Heinold and to what I hope is a long and mutually profitable relationship between us.

(FCT memo filed 9/26/83, ex. 4.)

In August 1978 GZB's status changed to that of independent contractors, and an Independent Contracting Agreement was signed. (FCT memo filed 9/26/83, ex. 2.) This agreement was much like the Corporate Branch Office Agreement, signed the next month. The first sentence of Paragraph 5 stated:

Heinold shall pay compensation to Independent Contractor dependent upon his profitable operation thereunder.

Paragraph 16 stated in its entirety:

Heinold may unilaterally terminate this Agreement for a breach of any of the Paragraphs of this Agreement.

GZB then decided to form FCT for the purpose of creating a pension plan, and the Corporate Branch Office Agreement was drafted and signed. In his affidavit Gardner states:

When we were negotiating the branch office agreement, I insisted on changing the termination provision, which was paragraph 17. The provision in the contract as submitted to us read "Heinold may unilaterally terminate this Agreement for a breach of any of the paragraphs of this Agreement." ... I discussed paragraph 17 with Heinold's counsel, Jim Patterson, by telephone in November or December of 1978. I told him that since it had been agreed that the relationship would be a continuing one so long as it was mutually profitable, I had no objection to a termination for cause provision, but that so long as Heinold wanted the right to terminate for cause, basic fairness would indicate that we should also have that right. Patterson acquiesced and I lined out the word "Heinold" and inserted the words "Either party."

(Gardner aff. ¶ 8.) The change referred to by Gardner is apparent from the face of the Agreement. Gardner notes that changing Paragraph 17 would have been unnecessary if the Agreement was terminable at will. (Gardner aff. ¶ 8.)

Gardner also states in his affidavit that he relied on the different wording found in GZB's registered commodity representative ("RCR") agreements with Heinold. The RCR agreements were entered into between Heinold and GZB personally, at the time the Corporate Branch Office Agreement was entered into between Heinold and FCT, apparently because FCT, as a corporation, could not be Heinold's RCR on the Chicago Board of Trade. The RCR agreements state, at paragraph 9, that "Heinold may unilaterally terminate this agreement at will." (FCT memo filed 9/26/83, ex. 3.) Gardner states that he did not object to this language in the RCR agreements, since they related only to a minor aspect of the arrangement with Heinold, but that he made certain that this language did not appear in the Corporate Branch Office Agreement. (Gardner aff. ¶ 8.)

This parol evidence generally supports FCT's argument that it did not intend that the Agreement be terminable at will. The parol evidence does not, however, raise a genuine issue of fact in support of FCT's

position that the Agreement contained a duration term based on profitability.

Gardner's statements to Klopfenstein concerning GZB's desire to enter into a permanent relationship do not support FCT's position, nor do the other references to a permanent relationship found in the parol evidence. (Gardner aff. ¶¶ 2, 6; Zins aff. ¶ 1.) The Appellate Court of Illinois recently has discussed the significance of the term "permanent" as used in connection with employment contracts:

> [I]n cases involving a vague or general expression of permanency the parties probably only intended to work together for as long a period as mutually satisfactory, with either party retaining the power to terminate the relationship at any time. Thus, "permanency" connotes steady, rather than temporary, employment, but not necessarily "lifetime" employment.

*Martin v. Federal Life Insurance Co.*, 109 Ill.App.3d 596, 602, 65 Ill.Dec. 143, 148, 440 N.E.2d 998, 1003 (1st Dist.1982).[6] Similarly, designating a contractual relationship as a "continuing" one does not imply that the parties have limited their power to terminate the relationship. (Gardner aff. ¶ 8.)

■ FCT's parol evidence of the origins and development of Paragraph 17 does not add much to the effect of Paragraph 17 itself. The parties may not have intended to create a contract terminable at will. The absence of such intent, by itself, is insufficient to create a cognizable duration term; it means only that the parties failed to recognize or face up to the legal implications of the contract they were entering into. The parties' intent is relevant and important, but it can raise a genuine issue of material fact only if it reasonably suggests that the parties actually did agree on a cognizable duration term. The court notes the vagueness of the duration term proposed by FCT, that the Agreement would continue so long as the arrangement was "profitable." For one thing, Gardner's affidavit indicates in one place that he understood the Agreement would continue so long as it was profitable to Heinold, and in another place that he told Heinold's counsel the Agreement would continue so long as it was mutually profitable. (Gardner aff. ¶¶ 6, 8.) FCT's proposed "profitability" term is vague also with respect to what would constitute profitability. An arrangement might be said to be profitable if it shows a net profit of $1.00. Another approach would measure profitability according to whether one party or the other could substitute a more profitable arrangement. This second approach would allow a party to terminate for economic reasons, which apparently is what happened in this case.

FCT's parol evidence does suggest one fairly definite measure of profitability. Zins states that in his meeting with Klopfenstein and Fivian he projected gross annual commissions in excess of $500,000 and net annual commissions in excess of $250,000. Fivian thereafter stated, according to Zins, that "the relationship would last so long as we were able to deliver net and gross commissions in quantities not less than our projections." (Zins aff. ¶ 1.)[7] Profitability, defined in terms of these projections, possibly would be sufficiently definite to be a cognizable duration term.[8] The

---

**6.** *Martin* recognizes that parties may enter into a contract whose duration term provides for lifetime employment, or for employment until retirement, and holds that additional consideration generally should not be required to prove such a contract if the parties' intention to create such a contract is manifested clearly. 109 Ill. App.3d at 599–604, 65 Ill.Dec. at 145–49, 440 N.E.2d at 1001–04. *Martin* does recognize a presumption against lifetime employment contracts. *Id.* at 602, 65 Ill.Dec. at 148, 440 N.E.2d at 1003. As pointed out by Heinold, there should be an even stronger presumption against similar contracts in the case of corporations and other artificial entities, since the existence of such entities often is of indefinite duration, and is not even limited by the bounds of human mortality.

**7.** The projections apparently were surpassed by 200% to 400%. (Gardner aff. ¶ 5.)

**8.** Contracts apparently were held to be binding in perpetuity, so long as specified quotas were met, in *Donahue v. Rockford Showcase & Fixture Co.*, 87 Ill.App.2d 47, 53–54, 230 N.E.2d 278, 281–82 (2d Dist.1967) (opinion on rehearing),

court holds, however, that FCT has not raised a genuine issue of fact suggesting that the parties had in fact agreed on this term. Neither the Gardner affidavit nor the Blankoph affidavit refers to these projections. FCT's brief also does not identify the projections as a contract term:

> GZB told Heinold that it could deliver customers to produce commissions in excess of $500,000 per year and that level of business would necessarily be profitable. The parties decided that a relationship would be mutually beneficial and commenced a discussion as to terms. One of the subjects discussed was the duration of the relationship and it was agreed that the relationship would continue so long as it remained profitable to Heinold (Gardner, Zins Aff's.).

(FCT memo filed 9/26/83, p. 2.) The court concludes, based on summary judgment standards, that the parties' contract did not contain a duration term based on Zins's projections.

■ The disputed issue of the parties' intent is not material to the court's construction of the Agreement. Even assuming that both parties intended in a general way to create some cognizable duration term based on profitability, it is clear that they failed to do so. In the absence of a cognizable duration term, a contract is terminable at will by operation of law, even if the parties do not specifically intend this result. The court therefore holds that there is no genuine issue of material fact as to the duration of the Agreement, and that it was terminable at will.

■ Even if the Agreement was not terminable at will, Heinold's termination was justified under Paragraph 17, because FCT had breached the Agreement. Paragraph 5 of the Agreement provides:

and *Liberty Industrial Sales, Inc. v. Marshall Steel Co.,* 272 F.2d 605 (7th Cir.1959) (applying California law). Because the court holds that the parties' contract did not contain a term based on Zins's projections, the court need not consider what effect should be given these precedents.

> [FCT] agrees to comply fully with all rules, regulations and policies of Heinold, the Commodity Futures Trading Commission, various commodity exchanges and any laws, rules, regulations and guidelines of government agencies that relate to the commodity futures and options brokerage business.

Heinold has identified violations by Gardner, Zins, and Blankoph during the period of the Agreement. Blankoph was found by the New York Mercantile Exchange to have committed a rules violation on December 6, 1979. The Adjudication Panel found that Blankoph, while executing an order for Heinold, preferred himself over Heinold by allocating better prices to himself. The Panel fined Blankoph $500. (Heinold memo filed 7/28/83, D. exs. 47, 60.)[9] On each of two occasions in October 1980, Comex fined Gardner $50 for rules violations relating to improper bidding. (Heinold memo filed 7/28/83, D. exs. 69, 70, 73.) In an administrative proceeding before the CFTC, Zins did not contest charges that he had violated certain provisions of federal law by failing to produce trading records. In the course of this proceeding, Zins confirmed that he had failed to disclose prior disciplinary proceedings in his re-registration applications made during the period of the Agreement. Zins was fined $5,000. (Heinold memo filed 7/28/83, D. ex. 32.)

FCT does not dispute that the violations occurred, but instead makes the following arguments. Zins and Gardner were engaged in activities on their own behalf, not on that of FCT, when their violations occurred. Blankoph was not found to have committed a violation until after Heinold already had notified FCT of its intention to terminate the Agreement. Finally, Heinold waived any right it might have had to terminate for these violations, because it failed to specify them as its reason when

9. This order apparently was among those FCT executed for Heinold to work off its liability for the York deficit. (Heinold memo filed 10/24/83, p. 4 n.) The York deficit forms the basis for Counts VII through IX of the First Amended Complaint, which are discussed below.

notifying FCT that it intended to terminate the Agreement.

The court need not decide whether violations by Zins and Gardner, in the course of activities on their own behalf, would violate the Agreement, since FCT does not dispute that Blankoph was acting on behalf of FCT, in executing trades for Heinold, when he preferred himself over the trades ordered by Heinold. That the Exchange did not render its decision until after Heinold's decision to terminate seems immaterial. The violation was committed during the period of the Agreement, and the violation constituted a breach of Paragraph 5 of the Agreement, regardless of whether or when the violation officially was recognized and punished.

As noted, FCT argues that Heinold waived its right to rely on the rules violations because it failed to specify them as its reason for termination.[10] The termination letters of January 7, 1981 and March 12, 1981 do not specify any reason for termination. (Heinold memo filed 7/22/83, ex. B, D. ex. 24.) A February 13, 1981 letter to an attorney for FCT cites no reason for termination, but states Heinold's position that the Agreement was terminable at will. (Heinold memo filed 7/22/83, P. ex. 28.) Gardner states in his affidavit that in March 1981 he asked Klopfenstein if FCT had given any cause for termination; Klopfenstein said that FCT had not given any cause, and that the decision to terminate was a business decision, based largely on a personality conflict with Pherson. (Gardner aff. ¶ 9.)

Heinold's position is that the existence of grounds for termination is sufficient to justify termination, regardless of what Heinold might have told FCT regarding its reasons. Heinold cites: *College Point Boat Corp. v. United States*, 267 U.S. 12, 15–16, 45 S.Ct. 199, 200–201, 69 L.Ed. 490

(1925); *Goldstein v. Stainless Processing Co.*, 465 F.2d 392, 395 (7th Cir.1972) (Illinois law); *Western Auto Supply Co. v. Sullivan*, 210 F.2d 36, 39–40 (8th Cir.1954); *Twentieth Century-Fox Film Corp. v. Lardner*, 216 F.2d 844, 854 (9th Cir.1954), *cert. denied*, 348 U.S. 944, 75 S.Ct. 365, 99 L.Ed. 739 (1955); *Farmer v. First Trust Co.*, 246 F. 671, 673 (7th Cir.1917) (Wisconsin law); *Heyman v. Kline*, 344 F.Supp. 1088, 1101 (D.Conn.1970), *rev'd in part on other grounds*, 456 F.2d 123 (2d Cir.), *cert. denied*, 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972); *Abendpost Co. v. Hertel*, 67 Ill.App. 501, 512 (1st Dist.1896); *Sterling Emery Wheel Co. v. Magee*, 40 Ill.App. 340, 343 (1st 1890).

■ FCT argues that the rule cited by Heinold applies only when grounds for termination exist at the time of the decision to terminate but are not discovered until after termination. (FCT memo filed 9/26/83, p. 10.)[11] The court disagrees with FCT. As the court understands it, the basic rule is that the party terminating a contract may assert any grounds justifying termination, whether or not it announced those grounds at the time of termination; the court does not inquire whether those grounds actually motivated the party to terminate the contract. *Sterling Emery*, 40 Ill.App. at 343. Most of the cases cited by Heinold consider whether this rule applies even where the asserted grounds were unknown at the time of termination, and thus could not possibly have motivated the decision to terminate. These cases confirm that the rule applies also to grounds for termination not known at the time of termination. *E.g.*, *College Point*, 267 U.S. at 15–16, 45 S.Ct. at 200–201. Rather than creating a special rule applicable to grounds not known at the time of termination, as FCT contends, these cases extend the general rule, and recognize that it applies whether or not the

---

**10.** The court does not understand FCT to be basing its waiver argument on the passage of time between the violations and Heinold's January 7, 1981 letter expressing its intent to terminate the Agreement.

**11.** Pherson was aware that there were pending investigations of Gardner, Zins and Blankoph. He was aware of the New York Mercantile Exchange proceedings against Blankoph. He apparently did not have detailed knowledge of any of the proceedings or investigations. (Pherson dep., pp. 132–33, 162.)

grounds are known at the time of termination. *See, e.g., Abendpost,* 67 Ill.App. at 512.

In addition to its attempt to distinguish these cases, FCT also relies on a line of cases which appears to conflict with Heinold's cases. FCT cites *Danberg v. Langman,* 318 Ill. 266, 271, 149 N.E. 245 (1925), and *Vargas v. Esquire,* 166 F.2d 651 (7th Cir.1948), *cert. denied,* 335 U.S. 813, 69 S.Ct. 29, 93 L.Ed. 368 (1948).[12] In *Danberg* the Supreme Court of Illinois stated:

> It is a well settled rule that when one party to a contract refuses to perform and bases his refusal on one ground he waives all other grounds, or is estopped, when suit is brought, from setting up other grounds for his refusal. *Gibson v. Brown,* 214 Ill. 330 [73 N.E. 578]; *Miller v. Gordon,* 296 id. [Ill.] 346 [129 N.E. 809]; *Vincent v. McElvain,* 304 id. [Ill.] 160 [136 N.E. 502]; *County of Schuyler v. Missouri Bridge Co.,* 256 id. [Ill.] 348 [100 N.E. 239]; *Ohio and Mississippi Railway Co. v. McCarthy,* 96 U.S. 258 [(6 Otto) 24 L.Ed. 693].

318 Ill. at 271, 149 N.E. 245. As noted by Heinold, *Danberg* and the Illinois cases it cites deal predominantly—if not exclusively—with defects, mostly in land titles, that could have been cured had the terminating party made its objection known. In *McCarthy* the Supreme Court was discussing defenses apparently based on impossibility of performance. In that case the defendant railroad, after asserting that a particular shipment was delayed due to unavailability of cattle cars, then raised (apparently for the first time in the Supreme Court) the new argument that shipment on Sunday, as requested, would have violated applicable blue laws. That shipment on Sunday was contemplated apparently resulted from the railroad's previous gross negligence, so it is not clear exactly how this additional argument would have improved the railroad's case.

Heinold has cited two cases construing *McCarthy* narrowly. In *Amsinck & Co. v. Springfield Grocer Co.,* 7 F.2d 855, 860–61 (8th Cir.1925), the court understood *McCarthy* as applying only where the usual elements of estoppel or waiver are met. In *Rand v. Cronkrite,* 64 Ill.App. 208, 223–24 (1st Dist.1896), the court read the rule stated in *McCarthy* as applying only to curable defects in form or detail.

The court believes that the *College Point* line of cases is applicable to the facts presented here, despite the broad language in *Danberg.*[13] *McCarthy* recognizes that it sometimes may be inequitable to allow a party to change its stated basis for refusing to perform. To go further, and to say that it always is inequitable to allow a party to change its stated reasons, would make no sense. Where land titles are at issue, as in *Danberg,* it generally would be inequitable to allow a party to refuse to perform for one stated reason, later to assert an objection based on a defect that easily could have been cured. In the present case, however, the rule violations could not have been cured. Blankoph could not have undone his transgression had Heinold identified the violation as a reason for terminating the Agreement. Heinold's failure to identify the pending disciplinary action against Blankoph did not deprive FCT of an opportunity to cure the defect in its performance, nor has FCT pointed to any detrimental change of position.

The court perceives an additional basis for distinguishing *Danberg* and the other cases. Heinold's position, as communicat-

**12.** The Court of Appeals for the Seventh Circuit followed *Danberg* in *Vargas,* 166 F.2d at 654, and apparently distinguished it in *Home Federal Savings & Loan Ass'n. v. Republic Ins. Co.,* 405 F.2d 18, 23 (7th Cir.1968). In neither case did the Court construe *Danberg* clearly.

**13.** As discussed above, the court applies Illinois law under the choice of law rules of the New York courts. In applying Colorado law in a fairly recent case, New York's Court of Appeals demonstrated a very strong willingness to limit Colorado cases to their facts, and to disregard dicta and other broad statements found in Colorado opinions. *Towley v. King Arthur Rings, Inc.,* 40 N.Y.2d 129, 351 N.E.2d 728, 386 N.Y. S.2d 80 (1976). It is doubtful, therefore, that the New York courts would consider themselves bound to follow the broad language of *Danberg.*

ed clearly in its February 13, 1981 letter, is that the Agreement was terminable at will. Assuming *arguendo* (but contrary to the court's actual holding above) that the Agreement was not terminable at will, it still must be held that Heinold at least had a plausible basis for believing the Agreement to be terminable at will. When a party believes it is entitled to terminate a contract at will, it often will refrain from stating its reasons. The party may also refrain from undertaking a complete (and possibly costly) investigation of possible grounds for termination. Should it turn out that the contract was not terminable at will, it would be unfair, without some additional showing, to preclude the party from asserting legitimate grounds for termination.

The court therefore holds that FCT's breach of Paragraph 5 of the Agreement justified Heinold in terminating the Agreement under Paragraph 17; further, the court holds that Heinold did not waive this basis for terminating the Agreement.

### Count I—Unjust Enrichment

In Count I FCT alleges that Heinold deliberately terminated the Agreement at a time when it knew that FCT would be unable to transfer its customers to another commodities firm with a large enough capital base to support FCT's customers.[14] As a result, FCT alleges, Heinold was able to retain FCT's customers, and now services their accounts and collects commissions from them. The alleged unjust enrichment is Heinold's retention of the full amount of these commissions, as it no longer divides the commissions with FCT.

 Under Illinois law FCT cannot state a claim for unjust enrichment. "[W]here there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no appli-

cation." *La Throp v. Bell Federal Savings & Loan Association*, 68 Ill.2d 375, 391, 12 Ill.Dec. 565, 572, 370 N.E.2d 188, 195 (1977), *cert. denied*, 436 U.S. 925, 98 S.Ct. 2818, 56 L.Ed.2d 768 (1978), *quoting Brooks v. Valley National Bank*, 113 Ariz. 169, 174, 548 P.2d 1166, 1171 (1976). The Appellate Court of Illinois recently has explained:

> The reason for this rule is not difficult to discern. When parties enter into a contract they assume certain risks with an expectation of a return. Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-contract for recovery. This the law will not allow. Quasi-contract is not a means for shifting a risk one has assumed under contract.

*Industrial Lift Truck Service Corp. v. Mitsubishi International Corp.*, 104 Ill. App.3d 357, 361, 60 Ill.Dec. 100, 103, 432 N.E.2d 999, 1002 (1st Dist.1982).[15]

In this case the Agreement makes no provision for the allocation of customers or commissions upon termination. Even if FCT did not realize that the Agreement would be terminable at will, it certainly was aware that the Agreement could be terminated under Paragraph 17. GZB knew that they were introducing customers to Heinold. That some or all of FCT's customers might remain with Heinold upon termination of the Agreement should not have been completely unforeseen, yet the Agreement does not provide that FCT shall receive some share of the commissions paid by such customers. For the court to award FCT a share of the commissions would be

---

**14.** The court refers to these customers as FCT's customers only for convenience. Paragraph 1 of the Agreement suggests that FCT solicited customers not on its own behalf, but "on behalf of Heinold."

**15.** The general unavailability of quasi-contractual relief as between parties to a contract is a

rule of Illinois contract law, giving a certain preemptive effect to the parties' contract. It is especially appropriate, for this reason, to apply the governing law provision in Paragraph 11 to FCT's unjust enrichment claim, even though that claim does not purport to be brought under the contract.

to supply a contract term which the parties could have, but did not, include in their Agreement. The court may not alter the allocation of risks and benefits provided for by the Agreement.

FCT's only attempt to support its claim is its citation to *P.S. & E. Inc. v. Selastomer Detroit, Inc.*, 470 F.2d 125 (7th Cir.1972). That case holds that upon early termination, in some cases, a party will be permitted to recover start-up expenses which it has not had time to recoup. *See also Burton v. Hitachi American, Ltd.*, 504 F.2d 721, 725–26 (7th Cir.1974). Both these federal cases apply Illinois law, but it is acknowledged that no reported decision of an Illinois court has ever adopted this rule; instead, the rule was drawn from general principles enunciated by the Illinois courts. 470 F.2d at 128. Since the rule is based largely on quasi-contract, it probably cannot be followed now that the Supreme Court of Illinois has spoken in *La Throp*.

Even if the rule is assumed still to be valid, the court accepts Heinold's argument that FCT has neither alleged nor offered evidence of any unrecouped start-up expenses. It appears that Heinold was responsible for such expenses. (Agreement ¶ 6.) FCT also cites to the "good faith" discussion in *Selastomer*, but it articulates no particular argument based on the implied duty of good faith and fair dealing. A cause of action cannot be based merely on invocation of "good faith" and a claim of ill treatment. This point is discussed well in *Gordon v. Matthew Bender & Co.*, 562 F.Supp. 1286, 1290–92 (N.D.Ill.1983) (Hart, J.).

## Count III—Tortious Interference with Economic Relationships

In Count III FCT alleges that Heinold and Pherson induced FCT's customers to terminate their relationships with FCT, upon termination of the Agreement. In support of its motion for partial summary judgment, Heinold argues persuasively that FCT cannot state a claim under Illinois

law. (Heinold memo filed 7/22/83, pp. 10–12.) FCT's responsive memorandum is not responsive on this point. FCT does not address any comments at all to Count III. (FCT memo filed 9/26/83.) Summary judgment on this count therefore is appropriate.[16]

## Count IV—Accounting

In Count IV FCT seeks an accounting, apparently to cover the entire period of the Agreement. Heinold's primary defense is that an account was stated between the parties for each month of their relationship.

Heinold sent FCT monthly income and expense statements, and FCT reviewed them sporadically. On some occasions, FCT brought discrepancies to Heinold's attention, and Heinold corrected the discrepancies. For the most part, however, FCT accepted Heinold's statements as they were, so long as they appeared generally to be correct. (Zins dep. pp. 36–38.) These facts, as stated by Zins, are sufficient to establish an account stated for each month of the parties' relationship:

> Repeatedly it has been held that where a statement of account is rendered by one party to another and is retained by the latter beyond a reasonable time without objection, this constitutes a recognition by the latter of the correctness of the account and establishes an account stated.

*Allied Wire Products, Inc. v. Marketing Techniques, Inc.*, 99 Ill.App.3d 29, 40, 54 Ill.Dec. 385, 393–94, 424 N.E.2d 1288, 1296–97 (1st Dist.1981). *See also, Protestant Hospital Builders Club, Inc. v. Goedde*, 98 Ill.App.3d 1028, 1032, 54 Ill.Dec. 399, 403, 424 N.E.2d 1302, 1306 (5th Dist.1981). FCT argues that an account stated must be based on the parties' mutual assent, and this proposition is correct, as a general rule. *Allied Wire* and *Protestant Hospital* make it very clear, however, that assent

---

**16.** FCT's utter failure to defend Count III makes it appropriate for the court to grant summary

judgment, regardless of what state's substantive law ought to govern this claim.

may be found in a party's failure to object to a statement of account.[17]

In support of its claim for an accounting FCT alleges, *inter alia,* that Heinold:

> improperly credited [FCT] with 90% and at other times with 95% of the interest earned by the monies on deposit of [FCT] customers, instead of crediting [FCT] with 100% of said interest.

(First Amended Complaint ¶ 75.) Blankoph testified at his deposition that FCT discovered it was only being credited for 90% of this interest income, while it believed it was entitled to 100% under the Agreement. The matter was brought to Heinold's attention, and FCT agreed with Klopfenstein that from that time Heinold would credit FCT with 95% of the interest income. After that agreement the matter was not discussed again, even though FCT still thought itself entitled to 100%, because FCT wanted to maintain good relations with Heinold. (Blankoph dep., pp. 28–31.) FCT argues:

> The basis for the willingness on the part of FCT to accept resolutions offered by Heinold was clearly the desire to maintain a continuing relationship. In that sense there was a failure of consideration for FCT's acquiescence. These disputes were resolved informally, without contracts, releases, etc. They amounted to nothing more than temporary working solutions rather than a legal foreclosure of issues.

(FCT memo filed 9/26/83, p. 16.) FCT offers no evidence that it conveyed its view of the 95% agreement to Heinold, and, in fact, FCT does not even appear to be arguing that it conveyed its view of the agreement to Heinold. FCT merely is asserting the mental reservations of its own principals, which are immaterial where FCT's conduct clearly indicated an intention to settle matters in dispute. FCT's failure of consideration argument is meritless.

FCT makes two arguments applicable only to certain months. From January 1981 to March 1981, i.e., from Heinold's notice of termination until termination, relations between Heinold and FCT were strained. FCT suggests that the parties' inability to agree on anything during this time precluded the meeting of minds necessary to support an account stated. The court rejects this argument. In his deposition testimony Zins expressed no reservations about these months. (Zins dep., pp. 36–38.) As to November 1980, FCT asserts that it complained to Heinold about that month's statement, but that the parties' differences were not worked out by the time the Agreement was terminated. (Zins aff. ¶ 2.) Zins's affidavit has not been controverted on this point, so the court cannot hold, by summary judgment standards, that there was an account stated between the parties for November 1980.

As argued by FCT, accounts stated may be opened for fraud, omission or mistake. *Meeker v. Fowler,* 35 Ill.App.3d 313, 318, 341 N.E.2d 412, 415 (5th Dist.1976). FCT has not, however, raised a genuine issue of fact as to the existence of any of these grounds.

FCT has submitted a three-paragraph affidavit from an accountant who has studied records obtained in pre-trial discovery. Paragraph 1 of this affidavit states the accountant's name and qualifications. Paragraph 2 describes his review of the records in general terms. Paragraph 3 states, in its entirety:

> The results of my audit are that for each of the years 1979, 1980 and 1981 (three months only) Heinold underreported the total of clearing house rebates received by it as a result of the business

---

**17.** FCT twice touches briefly on the fact that Paragraph 6 calls for monthly payments but refers to the annual computation of certain amounts. (FCT memo filed 9/26/83, pp. 11, 17.) The court understands FCT's observation to be offered as a reason why there could not have been monthly accounts stated, rather than as an independent argument for an accounting.

In any event, FCT has not developed its argument sufficiently for the court to consider it. That certain items might have required adjustment at year's end does not mean that there could not have been an account stated as to any item; further, FCT has given the court no reason to believe the necessary adjustments were not made and accepted by FCT.

of [FCT] and its predecessors, in the following amounts:

| | |
|---|---|
| 1979 | $ 4,445.50 |
| 1980 | $ 113,323.47 |
| 1981 | $ 48,347.20 |

for a total of $166,136.17.

(Yorkes aff. ¶ 3.) The affidavit and FCT's memorandum both indicate that the accountant has not completed his review of the records, but FCT has not requested additional time under Fed.R.Civ.P. 56(f). The accountant's unsupported statement of underreported amounts is wholly insufficient to raise a genuine issue of fact in support of reopening the parties' monthly accounts stated. Neither the court nor Heinold has any way of knowing how these figures were arrived at.

FCT also has submitted an affidavit from John A. DeAngelis, formerly employed by Heinold. DeAngelis states that he was placed in charge of the accounting department of Heinold's New York office in May, 1980, and that in that capacity he learned that the expenses deducted from FCT's share of the commissions were overstated. DeAngelis states that he knew of this overstatement because his accounts would not balance each month. He states that expenses properly attributable to house accounts were charged to FCT, and that the monthly overcharges ranged in amount from one to ten thousand dollars. DeAngelis states:

> I did not know if this fact was intentional or inadvertent, but in talking to Speziale [DeAngelis' superior] I was told that GZB never checked the figures and were content to accept whatever amounts were paid by Heinold.

(DeAngelis aff. ¶ 6.) The court holds that DeAngelis' affidavit does not raise a genuine issue of fact in support of reopening the accounts stated. In the quoted passage, DeAngelis suggests that what Speziale told him confirmed that the overcharges were intentional, but he does not give any context for Speziale's reported statement. Standing by itself, the comment attributed to Speziale is quite innocuous. DeAngelis states that expenses properly attributable to house accounts were charged to FCT, but FCT offers no specifics on this point, though it apparently has obtained relevant records in discovery. The DeAngelis affidavit thus does not help FCT stave off summary judgment.

Heinold therefore has established, beyond any genuine issue of material fact, that an account was stated between the parties for each month of the Agreement, except for November 1980. FCT has failed to raise a genuine issue of fact in support of opening the accounts stated. As to November 1980, FCT has made only the general claim that Heinold understated the commissions generated by FCT's customers. (Zins aff. ¶ 2.) The accountant's unsupported affidavit does not devote special attention to November 1980. FCT apparently has obtained the relevant records in pre-trial discovery, but it has failed to specify any errors. An accounting is available only in the absence of an adequate remedy at law. *Couri v. Couri*, 103 Ill.App.3d 445, 447, 59 Ill.Dec. 210, 213, 431 N.E.2d 711, 714 (3d Dist.1982). FCT has not made any showing that it has no adequate remedy at law, and summary judgment on its accounting claim therefore is appropriate.

### Counts V and VI—the Weiss Deficit

Paragraphs 6(c) and 11 of the Agreement make FCT liable for 80% of customer deficits, and provide that such amounts shall be deducted from Heinold's monthly allocation to FCT. One L. Herbert Weiss accumulated a deficit of almost $700,000, and 80% was charged against FCT (after partial satisfaction by the sale of an asset owned by Weiss). In Count V FCT alleges that Heinold breached the Agreement and various rules, regulations, and laws, in allowing Weiss to accumulate this deficit. In Count VII FCT alleges that Heinold was negligent in allowing Weiss to accumulate this deficit.

Heinold relies on a letter, signed by GZB as principals of FCT, structuring FCT's payment of its share of this and two smaller deficits. The letter refers specifically to the Weiss deficit, states FCT's share, describes the interest to be paid by FCT, and

provides for the deduction of $20,000 or $25,000 per month, depending on FCT's earnings, toward the payment of the three designated deficits. (Heinold memo filed 7/22/83, D. ex. 6.) Heinold relies on this letter as a binding agreement as to the parties' respective rights and liabilities, and Heinold argues that FCT cannot now contest its liability for 80% of the Weiss deficit. FCT states:

Such letter, respecting the Weiss account, amounts on its face only to an agreement that FCT would pay interest on the Weiss debit in return for a three month suspension of the payback, which previously and subsequently had been charged to FCT at the rate of $20,000 per month. The letter clearly did not purport to define legal obligations.

(FCT memo filed 9/26/83, p. 15.) The court rejects FCT's argument. Even if the letter actually was a modification of a prior payment plan, it still reflects an agreement that FCT would be responsible for 80% of the Weiss deficit.

## Counts VII, VIII and IX—the York Deficit

Heinold also charged FCT with 80% of the deficit accumulated by one Andrew York. FCT alleges that Heinold breached the Agreement and was negligent in allowing the deficit to accumulate, and FCT also argues that York was not its customer, and that it therefore should bear no responsibility for York's deficit. Count VII is a breach of contract claim, and Count VIII appears to be a negligence claim, although it also alleges that FCT had no responsibility for York. Count IX alleges, in part:

Thereafter, HEINOLD and [FCT] agreed that [FCT] would perform additional floor brokerage services for HEINOLD, and that all monies earned as compensation for said additional floor brokerage services would be applied by HEINOLD toward [FCT's] share of the Andrew York account deficit.

**18.** This allegation, by itself, may defeat Counts VII, VIII, and IX, as a judicial admission that

(First Amended Complaint, ¶ 105.)[18] Count IX goes on to allege that FCT did perform such additional floor brokerage services, and that Heinold is indebted to FCT for the value of such services, since the York deficit properly was not chargeable to FCT in the first place.

FCT initially objected to being charged with the York deficit. (FCT memo filed 9/26/83, ex. 7.) The parties later agreed that FCT would work off its share of the York deficit by performing floor brokerage services that Heinold otherwise would have had to pay others to perform. (Gardner dep., pp. 83–84, 100–01; Blankoph dep., pp. 35–38.)

On this motion FCT argues that York was not FCT's customer. As to the agreement FCT states:

A meeting was held with Heinold's principals and it was decided that FCT would absorb the deficit but Heinold would utilize GZB for floor brokerage services at normal rates until the deficit was absorbed in full; that way FCT would not be out of pocket as a result of the deficit. (Zins, aff.) Of course, this benefited Heinold in that it would have had to pay other floor brokers to perform the identical services.

(FCT memo filed 9/26/83, p. 16.) This, of course, is not a valid argument. Zins states in his affidavit that Heinold then refused to give FCT enough work to make up the deficit. (Zins aff. ¶ 4.) Heinold apparently forgave the unpaid portion of the York deficit upon termination of the Agreement, so Zins's statement appears to be immaterial. (Heinold memo filed 7/22/83, D. ex. 22.)

Summary judgment in favor of Heinold is appropriate. FCT has not attacked the parties' settlement of the York dispute in any significant way.

## Conclusion

The court grants defendants' motion for partial summary judgment as to Counts I through IX of the First Amended Com-

the parties settled the York dispute.

plaint. Counts X and XI remain in the case, as does Heinold's counterclaim against FCT, Gardner, Zins, and Blankoph.

It is so ordered.